C. G. GANTLING, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

Criminal Law—Corpus Delicti—Confessions.

It is for the court to decide in the first instance whether the evidence of the *corpus delicti* is *prima facie* sufficient to authorize the introduction of confessions by the accused. As a basis for the introduction of confessions the *corpus delicti* need not be proven beyond a reasonable doubt. The *corpus delicti* of any offence may be proven as well by circumstances as by positive testimony; and if, when the confession is offered, there be already before the jury evidence tending to show that the offence to which the confession relates has been committed, the court should admit the confession if freely and voluntarily made. Tested by this rule: *Held*, That the evidence tending to establish the *corpus delicti* was sufficient to admit the confessions of the accused; and that the evidence in the cause was sufficient to sustain the conviction.

Writ of error to the Circuit Court for Hamilton county.

### Statement.

The following is a statement of the substance of the evidence in this cause, upon which the decision of the court is predicated:

T. H. Alexander, for the State, testified: I know the defendant (pointing him out). I know Barr Groff, some-

time in the fall of 1896 he came to me and we went out
to the west side of the town of Jasper; we there found
the remains of a dead human body.  When I got there
part of the body was uncovered.  It had been covered
up in that swamp; we uncovered it and came down and
got Mr. Math James, the deputy sheriff, to go with us.
After we got up there the County Judge was sent for
and a coroner's jury was empaneled; then the jury went
to work investigating.  They made inquiries to find out
who was missing.  They heard that the defendant had a
daughter missing.  Some of the jury went to his house
about sundown.  I went, but did not get there as soon
as the others that went, but was only a few steps be-
hind them.  When at the defendant's house I saw him
and his wife and children.  He was asked if he had a
girl missing, and answered that he did; they said she had
been missing since about July the same year.  An ex-
planation was made to him of the clothing that was
found on the body, and he was asked to go down and see
if he could identify the body, he was asked two or three
times to go before he went.  The jury asked his wife
what kind of clothing this girl wore, and she said they
were made out of gingham, or homespun; she described
the buttons found on the body.  She gave as good a
description of the clothes that were found on the body,
in telling what kind of clothes Lilly wore, as I could.
The dress was made out of homespun, was opened in
the back, and had white buttons on it.  I knew Lilly
Gantling in her lifetime, and was familiar with her cloth-
ing.  She generally wore this checked homespun or
gingham.  All the family wore clothing mostly alike.
Her dresses were made waist and skirt, sewed directly
together and was opened in the back.  The apron was
peculiar in this, that it had a bib on it.  The same kind
was found on the body.  Clothing was found on the

dead body such as I have described. As soon as we told the defendant what had been found up there in the swamp he said something about going up there, and after being requested two or three times he went about sundown or a little later. After looking at the things found there, we asked him if it was his daughter, and he said that there was nothing there to prove to him that it was his daughter. The dead body was that of a colored person. We saw a great many people in passing. The body was found in a swamp near the edge. There was no water there when we found the body. When found, the body was all covered except one leg. I think the body was brought up to the court house. This occurred in Hamilton county, Florida, in 1896, about the first of October. I have not seen Lilly Gantling since the summer of 1896, and up to the finding of that dead body I heard of no one making inquiry about her. I would have been suspicious at once if I had. The coroner's jury was empaneled on Sunday, and was in session until Wednesday afternoon. I saw the oil-cloth that was found near the dead body. I recognized it as being similar to the one used by the defendant. I had seen him use his a great many times, and am satisfied that it was the same cloth. I lived next to a house where the defendant came often to get passengers to carry out to mills and stills, and saw him there using his oil-cloth a great deal. He carried a great many passengers in doing his business. The oil-cloth was of unusual size. I never saw one the same size before that I recollect. Cross-examined: This homespun dress goods and these white buttons were common among the negroes at the time, and bibs on aprons were common among children at the time. The defendant did not at any time refuse to go to the dead body, but I thought that he was reluctant, because when first asked he did not signify his

willingness to go. The swamp where the body was found lies in the northern edge of Jasper—west of the S. F. & W. Ry. It is about two hundred yards from east to west, and about a quarter of a mile from north to south. It is all swampy. There was at the time a saw-mill located just north of that pond, and among the hands were a good many negroes. Persons, when coming from this saw-mill quarter to Jasper, would generally, when coming on foot, come on the railroad which ran through the east end of the swamp; but there was a wagon road on the west side of the swamp and another on the east side. The body was found about forty or fifty yards from the road on the west side. During the Sunday on which this body was found a great number of people went to where it was found. They were coming and going nearly all day, and in crowds from one to eight and more. The pond could not have been dry very long. I think there was some water in the swamp at the time, in holes about.

T. A. Pollhill, for the State, testified: I am sheriff of Hamilton county, and was sheriff in 1896. I summoned the coroner's jury to serve at the inquest holden over this body. I picked up the oil-cloth that was found up there, and it looked like one that the defendant used to cover his wagon. I had never heard that the defendant had a missing daughter until this body was found. He nor any of his family ever said anything to me about her being gone.

Peter Gillilee, for the State, testified: I was at the place where this dead body was found on Monday after it was found. Sandy Sheffield and I, on Monday morning, found an oil-cloth twenty-five or thirty yards from where the body was found. It looked as if it had been dragged a piece and dropped. It was about seven feet long, and about five feet wide; it was black. I examined

it afterwards and it looked like one the defendant used in hauling. I recognized it as his.

A. M. Knowles, for the State, testified: I was on the coroner's jury of inquest over this dead body. We saw part of the body sticking out of the mud; the balance of it was covered up. We took the body up. It was the body of a human being. We made inquiry if anyone was missing in the town, and J. F. Cobb told us late in the day that the defendant had a daughter missing. Col. Johnson sent some one after Gantling; he did not come until we went up there. I do not know whether he received the message or not. The messenger was sent in the afternoon. We went down to his house about sundown. I got to his house ahead of the others and saw Gantling coming from across the street. I said to him, why haven't you been down to see the dead body. He replied that he was going. We went in and had some talk with him and his wife. I asked her in regard to the clothing, and she told me that the dress was open in the back. One of the children was standing by; she pointed to him and said that was the kind of buttons. That same kind of button was on the dress found on the dead body. After awhile he and his wife went with us to where the body was; they both looked at it and said there was nothing there that they could identify it by to be their daughter. The description that she gave of the clothing compared well as far as I could see with the clothing found on the body. She said they were open in the back, and Lilly wore an apron. The body had on an apron with a bib on it. I saw the oil-cloth that was said to have been found up there on Monday. I saw the place where it was said to have lain; it was damp; it was near the body, in about forty yards. It was a black oil-cloth about four feet wide and about eight feet long. I recognized it as one I had seen before in the

possession of the defendant.  I recognized it to be his only because he had one about the same size; it was worn and old.  I had seen him driving about with one on his wagon.  I saw some broken bushes between the oil-cloth and the body, I suppose some six or eight, extending about half way between them.  I have lived in Jasper two or three years and never heard of Lilly Gantling being missing before this body was found. Dick Hill and J. F. Cobb were both at Claib's house when we got there.

D. B. Johnson, for the State, testified:  I was County Judge of Hamilton county, and acted as coroner over the dead body in question.  I sent Cobb about an hour by sun to tell Gantling to come down there, and he left going in that direction.

J. F. Cobb, for the State, testified:  On Sunday I was where the dead body was found.  I was not sent to see Gantling that day, but did see him about two or three o'clock.  I told him what had been found in the swamp; he told me that he had a missing girl.  I heard that day through Tom Simmons that he did have a girl missing.  Gantling and I are members of the same Masonic lodge and church.

Joe Cox, for the State, testified:  I saw the dead body, and the clothing that was on it before the body was moved.  I moved the body.  I first got a pitchfork, picked up the bones with it, put them in a box and brought it to the court house.  I then took the clothes to my place, washed them and brought them back to the court house.

Mariah Cobb, for the State, testified:  I lived in the summer and fall of 1896 just north of the S., F. & W. depot, on the west side of the railroad, and right at the edge of the swamp in which this body was found.  I saw the dead body, and lived about a quarter of a mile

from where it was found. I lived there about the first of August, 1896. About the first of August I heard something unusual; it attracted my attention. I heard someone screaming. It was between midnight and day. It seemed like a girl's voice. It looked like she started to run. Someone told her to come back. I heard the girl's voice first. She hollered "O Lord." She struck for a run. One man said to the girl don't go another step further. They were about fifty yards south of my house then. About a quarter of an hour later, I heard a voice on the other side of my house say "O Lord;" it was the girl's voice, and was north of my house. The body was found northwest of my house. I knew Lilly Gantling; sometime I would see her once and twice a week. I saw her last about the last of July, or the first of August, 1896. I judged her to be then fourteen or fifteen, or possibly sixteen, years old. I saw Lilly Gantling about two months, or possibly longer, before this dead body was found; she seemed to be in pregnancy. I saw the body that was found and recognized it as Lilly Gantling's by the teeth—they stuck out—and by the clothing. I heard before this that Lilly was gone; none of Gantling's family told me; I heard it by rumor; Richard Cobb told me. I am satisfied that it was Lilly Gantling's body. It was a dark rainy night that I heard these screams. Cross-examined: My nearest neighbors on the north side of me in 1896 were about three or four hundred yards. There is a big hammock or swamp that prevented anybody living closer; this come to within about twenty yards of my house. Mr. Cummings' mill hands, mostly darkies, were living just north of that pond in 1896. Sometimes in going to Jasper they would take the railroad, and sometimes the dirt road; when they took the railroad they would pass within sixteen or seventeen yards of my house. I am well acquainted

with Claib Gantling, and was with Lilly Gantling. I knew their voices, but I did not recognize his or her voice on this night. I heard two men's voices and one girl's voice. I did not recognize any of their voices. The last hollering that I heard seemed like it was in the swamp, but was closer to me than where the body was found. It was north of my house. I don't know whether it was common or not for the sporting class of people to pass my house between midnight and day at that time. When I heard these screams I thought it was the sporting class. Lilly Gantling was advanced in pregnancy—about two, three or four months. I am not a midwife. I knew the body to be Lilly's body by the mouth, head and clothes. Her clothes were unusual, in this, that the material was checked homespun. I recognized her not from the dress, but from the cloth. This hollering occurred towards the last of the week. I did up some clothes for a white man at the stables the next day after I heard this hollering; I knew by this that it was not Saturday night. I heard of Gantling making search for his daughter. I heard that he sent his son to look for her. I heard this by rumor. He sent his son to Live Oak. I heard of all this before the dead body was found—a month or such a matter. Lilly had been gone somewhere about two months when this dead body was found.

Emma Bell, for the State, testified: I knew Lilly Gantling. I saw the dead body that was found down there. I had not seen Lilly Gantling in about two months. I heard before the body was found that Lilly Gantling had run away. I did not hear any of the family inquiring about her. I was well acquainted with her. I saw her pretty often when I would come up town to the restaurant. I saw the clothing that was found on

the dead body. I have seen Lilly Gantling wear those clothes or some like them.

A. S. Humphreys, for the State, testified: I am a physician. I saw the dead body in question. The body was that of a female. I came to this conclusion partly from my knowledge of the anatomy of the human body, and partly from the clothing that it had on. As far as the anatomy of the body is concerned, I helped to take it up through curiosity, and examined the pelvis closely. I came to the conclusion that it was a female. Cross-examined: I noticed both the clothing and the form of the body in coming to the conclusion I did. There is a striking difference in the pelvis of a male and a female. The pelvis of the female is broader than that of the male. There is a difference in the slope of the two. The female pelvis is flared out. I did not examine that pelvis minutely.

Billy More, for the State, testified: In the fall and summer of 1896 I was working in Jasper, and commenced to board with the defendant on the 25th day of July of that year. When I first went there he had two daughters waiting on the table for about a week, then only one. I boarded there a month or two. I never saw the missing girl after about a week after I first went there. About two weeks after I failed to see her waiting on the table I heard the defendant's wife speaking about it. They had a daughter by the name of Minnie, and I was teasing her about getting married and running away to do so, when the defendant's wife said that she had had one girl to run away lately, and that she did not want another to do so. She said that Lilly was a smart girl, and that whoever had her had a good girl; that she thought that Lilly had just found out that she was not her mother, and that she had left to go to some of her people. I was not boarding there when the body was

found, but saw the clothing that was found on the dead body. I supposed them to be Lilly Gantling's. She wore some like them. I took them to be the ones that she wore. When this conversation occurred I was eating at the private table of the defendant; he never said anything to me about her being gone.

Peter Bryant, for the State, testified: I was in town nearly every day during the fall of 1896, and generally took my meals at the defendant's restaurant. I knew Lilly Gantling; I saw her last about the first of August, 1896; she usually waited on the table. I saw the dead body that was found up here about the first of October of that year. I saw the clothing that was found on that body, and am satisfied to the best of my knowledge that they were Lilly Gantling's. After I missed the girl from the restaurant I never heard the defendant or any member of his family or anybody else ever say anything about her up to the time this dead body was found.

Lewis Simmons, for the State, testified: I have been convicted of larceny, but have been pardoned. I know the defendant, and knew his girl Lilly. I saw her last in life the latter part of July, 1896; up to that time I saw her pretty regular at her father's resturant. I saw the body that was found here, and think, to the best of my knowledge, that I had seen the same body in life. I think that it was the body of Lilly Gantling by the clothing and hat. The hat was similar to the one I had seen her wear. I saw her about the latter part of July, 1896, in Capt. Hanna's store. The hat she had on was the same kind of hat; it had a torn place in it, as did this one, and I pulled her ear through the torn place in the hat. I recognized the clothing mostly by the apron being similar to the one I had seen her wear around the restaurant; it was a bib apron. I saw the oil-cloth that was found there; I recognized it as being the defend-

ant's or one very much like it.   I saw him use his often
to cover his wagon.   The one I saw him use was about
the same size.

Ike Coleman, for the State, testified:  I know the de-
fendant.   He and I had a conversation in the jail, just a
short while before his former trial, in reference to this
case.   The conversation was in jail and was perfectly
free and voluntary on his part.   I was coming out on
bond.   He said Ike, we are both colored, and it stands
we colored people to stand by each other.   I said I
would.   He said if you will, I will see that you don't re-
gret it.   He said go up in Georgia and write a letter to
me, sign your name as my daughter; that letter will do
me lots of good in my case.   He said sign Lilly's name
to the letter.   He called me several times after I got
out; I told him I did not have time; he finally sent me
word to come, that he wanted to see me, and I went.
He said Ike, have you attended to that business for me.
I told him yes.   He said that he had not got a hearing
yet, and I told him that he would get one, but he didn't
get one, because I didn't write it.   I got out on bond,
but am still under the same charge of having a fuss with
a preacher.

Dick Hill, for the State, testified:  I know the de-
fendant.   I was at his restaurant the day the body was
found that was supposed to have been that of Lilly Gant-
ling.   I got there after dinner.   J. F. Cobb came down
during the afternoon, and had a conversation with the
defendant that I did not hear.   Cobb stayed about fifteen
minutes; he did not come back any more during that
day.   After Cobb left the defendant made a statement
to me freely and voluntarily, and without any induce-
ments or offers held by me to him.   He said let's look
at that paper I got from Liberia.   He said that he was
going to Liberia, and I said I would go with him.   We

sat down and then we got up; then he said that he want-
ed to see me.   Come into the room he says, I want you
to look at some things for me.   He said I want you to
do a little something for me; I am in trouble.   I said
what is it?   He said I killed my daughter.   I said why
did you kill her?   He said, because I bigged her.   I said
couldn't you do anything else with her?   He said no,
because she told it around to white and black.   Cross-
examined:   I am no doctor.   I am a fortune teller.   I
tells a little something in the cards.   I can not read and
write.   I got to Gantling's just after dinner and stayed
with him in that room until sundown.   There was noth-
ing in the room but a table and a pint of whiskey.   When
we got in the room he said he wanted me to look over
some things for him, and I did, and I told him you see
that card, and he said yes; I says you are in trouble, tell
me your trouble; he said I killed my daughter—not my
wife's child—I got to fooling with her and bigged her.   I
told her not to tell anyone and when the time came I
would send her off.   The card spoken of was a club,
it was the spade spot.

Arch Thompson, for the State, testified:   I was con-
victed of larceny but have been pardoned.   I know the
defendant.   I came to Jasper on the day the dead body
was found, about three o'clock.   I saw the defendant
that evening about sunset coming from the dead body.
I was going to it.   I had a conversation with him on the
Taylor steps near his restaurant.   I said to him do you
know anything about the death of this girl?   He said
no.   I said if you know anything about it tell it to me.
He said no, he did not know anything about it.   I said
if you don't mind before the sun goes down Monday
evening the white folks will have you or some of your
family in jail. He said do you reckon; and I said all right
Then he said come here, I want to see you.   We got up

and went down to Mr. Adams' lot and lay down in the gall-berry bushes. He then said I tell you, Arch, I am in trouble. He said if I tell you something will you tell it; and I said I didn't know whether I would or not. He said well I will tell you, and then said I killed my daugh-.ter. I said no you didn't; he said yes I did; and I said no you didn't; he said I had it to do; I said no you didn't; he said I carried her off, Dellege held her hands and I cut her throat with my razor. Just at that time Peter Davis spoke and we jumped up. Claib went to Dickson's house and I stopped and talked with Peter. This was Sunday night.

Peter Davis, for the State, testified: I know Arch Thompson and the defendant. I saw them together near Adams' lot in Jasper on the day the dead body in question was found, about eight o'clock in the evening; they were talking. Arch was lying down and the defendant was squatting down with his back to me. I passed within three steps of them. They were talking when I came up. I could not hear what they were say-ing. I spoke to them and asked if they were talking secrets, and they said no. The defendant then went across the road and Arch and I had some talk. Both of them were talking when I went up. I could distinguish their different voices, and knew that they both were talk-ing. I do not know that I can tell which was talking the most. I could hear Arch plainer than I could the de-fendant, but could not tell what he said.

B. Rainey, for the State, testified: I lived in Jasper, and was the night watchman of the town about the first of August, 1896. One night about that time, late at night, after ten or eleven o'clock, I don't know which, I heard some hollering like that of a woman. It sound-ed like it was smothered, and by a person in distress. I could not hear it plainly. I could not tell which way it

was, for the reason that I am partially deaf in one ear, and can not locate sound very well. This occurred on a dark, damp, rainy night. It had been raining from then until the finding of the dead body in question. I never heard of the defendant or his family making any inquiry about a missing girl.

Here the State rested its case.

The defendant here introduced divers witnesses who testified to the bad character for truth and veracity of the State's witnesses Arch Thompson and Dick Hill, and as to contradictory statements made by both of them to what they testified to on the stand; also several witnesses who testified to the fact of the defendant's having made inquiry and search for his missing daughter, Lilly Gantling, prior to the finding of the body. One of them testifying that the girl had run away from him on one occasion before this. One of the defendant's witnesses, the publisher of a newspaper in Jasper, testifying that after the discovery of the dead body, and after the defendant's incarceration, the defendant's wife tried to get him to publish an advertisement for the missing girl.

Dellege Gantling, for the defendant, testified to a wide search made by him for the missing girl prior to the finding of the body, and said he always went in search of her at his father's direction.

The defendant on his own behalf testified to having made diligent and wide search for his missing daughter immediately after her disappearance, asserted his innocence, denied the confessions, and the attempt to get a. letter written to him in his daughter's name, but failed to deny the ownership of the oil-cloth found near the dead body, or to account for its presence there.

The State introduced several witnesses in rebuttal who testified to the bad character for truth and veracity of one E. M. Fishburn, a witness for the defendant, who

undertook to impeach the character for truth of one of the State's witnesses; and others who testified to the good character for truth and veracity of Arch Thompson, a State witness. These witnesses also impeached the evidence of the defendant touching details of his alleged search for his daughter.

Here the testimony closed, and the State Attorney announced that he abandoned the first count of the indictment that alleged that the murder was committed with a razor, but would rely upon the second count that alleged the murder to have been committed by means to the grand jurors unknown.

The other facts in the case are stated in the opinion of the court.

*Mallory F. Horne*, for Plaintiff in Error.

*The Attorney General*, for Defendant in Error.

TAYLOR, C. J.:

The plaintiff in error was indicted for murder in the first degree of one Lilly Gantling, at a special term of the Circuit Court for Hamilton county held in October, 1896. He was tried upon this indictment at the Fall term, 1897, was convicted of murder in the first degree and sentenced to die. This judgment was reversed by this court on writ of error, in April, 1898, and the cause remanded for a new trial. Gantling v. State, 40 Fla. 237, 23 South. Rep. 857. He was again tried at the January term, 1899, of the Circuit Court for Hamilton county upon the same indictment, was again convicted of murder in the first degree, but, on the recommenda-

tion to mercy by the jury, was sentenced to life imprisonment in the State penitentiary, and from this judgment again comes here by writ of error.

At the trial Ike Coleman, a witness for the State, after testifying that he knew the defendant, and that he and the defendant had a conversation in the jail, in reference to the case, a short while before the defendant's former trial, and that such conversation was perfectly free and voluntary on his part, was asked to state what was said by each of you? The defendant objected to the witness answering the question on the grounds that the answer was immaterial and irrelevant to the case, and because there had been no sufficient proof of the *corpus delicti* to authorize the introduction in evidence of a statement, admission or confession, or conversation of the defendant. These objections were overruled, the ruling excepted to, and it constitutes the first assignment of error. The witness then testified, in answer to the question, as follows: "Me and him was talking, and I was coming out on bond; he said 'Ike, we are both colored, and it stands we colored people to stand by each other.' I said I would; he said, 'if you will I will see that you don't regret it;' he says 'go up in Georgia and write a letter to me, sign your name as my daughter; that letter will do me lots of good in my case;' he said 'sign Lilly's name to the letter.' He called me several times after I got out; I told him I did not have time; he finally sent me word to come, that he wanted to see me, and I went; he said 'Ike, have you attended to that business for me;' I told him yes; he said that he had not got a hearing yet, and I told him that he would get one. This conversation occurred in the day time. I was in the jail at the time for fussing with a preacher." The defendant after cross-examining this witness, moved the court to strike out his evidence because it was not relevant or

material to the issues in the case, and because there was no sufficient proof of the *corpus delicti* to authorize the admission of testimony of this character. The judge overruled the motion, to which exception was taken, and this ruling constitutes the second assignment of error.

Dick Hill, a witness for the State, after testifying that he knew the defendant, and that the defendant had made a statement to him at the defendant's restaurant on the day the body was found that was supposed to be that of Lilly Gantling, and that such statement was made offers held by me to him, was asked by the State Attorney to state what he said to you? The defendant objected to the introduction of this testimony upon the ground that there had been no sufficient proof of the *corpus delicti* to authorize the introduction of a confession in evidence against the defendant. The judge overruled the objection and permitted the question to be answered, to which the defendant excepted, and such ruling constitutes the third assignment of error. The witness then testified that the defendant in that conversation had confessed to him that he had killed his daughter because he had bigged her, and because she had told it around to white and black.

The admission in evidence of the defendant's confession to another witness for the State, Arch Thompson, was objected to by the defendant upon the same ground as that of the witness Dick Hill, but the objection was overruled, and such ruling was excepted to, and constitutes the fourth assignment of error.

There was no error in any of these rulings, and the objection made that these confessions were admitted without sufficient prior proof of the *corpus delicti* is without foundation. In the case of Holland v State, 39 Fla.

178, 22 South. Rep. 298, this court has held that the court must decide in the first instance whether the evidence of the *corpus delicti* is *prima facie* sufficient to authorize the introduction of a confession by the accused in evidence; that the *corpus delicti* need not be proven beyond a reasonable doubt as a basis for the introduction of a confession of the accused; that if, when the confession is offered, there be already before the jury evidence tending to show that the offence to which the confession relates has been committed, the court should admit the confession, if freely and voluntarily made; that the *corpus delicti* of an offence may be proven as well by circumstances as by positive testimony. The State, prior to the introduction of these confessions, had introduced evidence tending to establish the following facts: The defendant had a daughter, Lilly Gantling, who was about grown, and who lived with him helping him in his business of keeping a restaurant. Prior to her disappearance she had become pregnant. She disappeared from her father's restaurant suddenly about the first of August, 1896, and had not been seen alive or heard of since; that one dark rainy night about the first of August, 1896, between midnight and day, a witness, living near the swamp where the dead body was afterwards found, heard the voice of a girl screaming "O Lord," and that it sounded as though she started to run; then she heard a man's voice say to her "don't go another step further," and that in about a quarter of an hour later the witness heard the girl's voice in the swamp, in the direction of where the body was afterwards found, still distressfully exclaiming "O Lord;" that some two months after this, or about the first of October, 1896, a dead body was found in the aforesaid swamp buried in the mud all but one leg. Upon being exhumed it was identified as being the skeleton of a woman about the

size of the defendant's missing daughter.  The clothing
and hat found with the body were identified as being
those worn by Lilly Gantling just before her disappear-
ance, and the remains were further identified as being
hers by the protruding teeth.  At about the same time
with the finding of the skeleton, and some forty or fifty
yards away from it, on the edge of the swamp, there was
found a large oil-cloth that appeared to have been
dragged some distance and then dropped, and the bushes
between the oil-cloth and the dead body appeared to
have been broken down.  This oil-cloth was identified
as being that of the defendant.  Several witnesses,
among them the sheriff of the county, testified that
they never heard of the defendant making any effort
to find his daughter after her disappearance.  It was
shown further that the coroner, who held the inquest
over the remains, on being informed that the defend-
ant had a missing daughter, sent for him to view the
remains and clothing found with it to see if he could
identify them, and that he was tardy in responding to
the message; and that he and his wife, who was the
deceased's step-mother, on going to the place dis-
claimed any recognition of either the remains or the
clothing or hat found with them.  This we think was
sufficient to establish the *corpus delicti*, at least *prima
facie*; and, under the rule laid down in Holland v. State,
*supra*, went far enough to justify the admission of the
confessions, when shown to have been freely and vol-
untarily made.  The testimony of Ike Coleman rela-
tive to the effort of the defendant, while in jail under
this charge to get him to go up into Georgia, and
from there to write a letter to the defendant over the
name of the deceased, was pertinent and admissible,
because it tended to show an attempt on the defend-
ant's part to conceal his crime by false and fraudulent

means, designed to make it appear that his daughter was still alive.

The fifth and last assignment of error is the overruling of the defendant's motion for new trial, upon the ground that the verdict was contrary to the evidence. There was considerable conflict in the evidence, but the jury, within their exclusive province, have settled those conflicts on the side of the evidence for the State, of which, when given credence, there was sufficient to sustain the conviction had, and this becomes more convincing since two juries have come to the same conclusion upon it.

Finding no errors, the judgment of the court below is affirmed.

CARTER, J., dissenting:

The indictment against plaintiff in error contained two counts, the first charging that the offence was committed with a razor, the second that it was effected in a manner and by means unknown to the grand jury. At the close of the testimony the State Attorney announced that he abandoned the first count and would rely upon the second count for a conviction. Aside from defendant's alleged confessions the evidence was wholly circumstantial, and, to my mind, of the loosest and most uncertain character. As the opinion of the court states only what in its opinion the evidence tended to prove, and that in a very general way, I shall state the evidence with more particularity and point out the particulars wherein, in my opinion, the court has drawn improper conclusions. The defendant was a restaurant-keeper in the town of Jasper, and also kept teams for hire. He was a man of family consisting of his wife and several children, several of whom appear to have been grown, though their exact ages are not shown. One of his children, Lilly, a daughter

by a former wife, was a waiter at his restaurant, but the
only reference to her age in the record is that a wit-
ness "judged her to be then fourteen or fifteen, or pos-
sibly sixteen, years old." In the northern edge of the
town of Jasper there was a swamp, in size "about two
hundred yards from east to west and about a quarter
of a mile from north to south." The Savannah, Flor-
ida & Western Railway ran through the east end of
the swamp, and a wagon road ran along the east, and
another along the west side. Just north of the swamp
a saw-mill was located, and among the hands were a
good many negroes. Persons going from the saw-
mill to Jasper on foot generally came the railroad.
Mariah Cobb, a State's witness, lived on the west side
of the railroad just north of the depot and "right at the
edge of the swamp," and about a quarter of a mile from
the spot where a dead body was found in this swamp.
She says "about the first of August (1896) I heard
something unusual; it attracted my attention; I heard
someone screaming; it was between midnight and day;
it seemed like a girl's voice; it looked like she started
to run, someone told her to come back. I heard the
girl's voice first; she hollered 'Oh Lord;' she struck
for a run; one man said to the girl, don't go another
step further; they were about fifty yards south of my
house then. About a quarter of an hour later I heard
a voice on the other side of the house say 'Oh Lord:'
it was a girl's voice and was north of my house. The
body was found northwest of my house, it was a dark,
rainy night that I heard those screams." She also
stated that the mill hands, mostly darkeys, in going
to Jasper would sometimes take the railroad, and
sometimes the dirt road; that in going the railroad they
would pass within sixteen or seventeen yards of her
house. She further testified "I am well acquainted with

Claib Gantling and with Lilly Gantling. I know their voices, but I did not recognize his or her voice on this night. I heard two men's voices and one girl's voice. I did not recognize any of their voices. The last hollering that I heard seemed like it was in the swamp, but was closer to me than where the body was found. It was north of my house." She could not locate the time any more definitely than as being "about the first of August." She knew it occurred "towards the last of the week," but knew it was not on Saturday night. Another witness testified that he was night-watchman of the town of Jasper; that "on a dark, damp, rainy night," about "the first of August," he "heard some hollering like that of a woman; it sounded like it was smothered, and by a person in distress;" that he could hear it plainly, but could not tell which way it was "because he was partially deaf in one ear." The only evidence besides defendant's confessions as to the pregnancy of Lilly Gantling was the testimony of Mariah Cobb, that "I knew Lilly Gantling. Sometime I would see her once or twice a week. I saw Lilly Gantling about two months or possibly longer before this body was found; she seemed to be in pregnancy;" and, on cross-examination, "Lilly Gantling was advanced in pregnancy about two, three or four months. I am not a midwife." About the first of October, 1896, the remains of a dead human body were discovered in the western edge, and near the northern end, of the swamp mentioned above, about forty or fifty yards from the dirt road which ran along that side. One of the witnesses states that the swamp was "all swampy, the pond could not have been dry very long. I think there was some water in the swamp at the time in holes about." Another witness says it had been raining from about the first of August until the finding of the body. When the body was dis-

covered it was covered with mud except one leg. The
testimony does not show how deep the body was cov-
ered, or whether it appeared to have been put in a hole
dug for the purpose. One witness says "we saw part
of the body sticking out of the mud, the balance of it
was covered up." Another says "I did see the dead
body and the clothing that was on it before the body
was moved. I moved the body. I first got a pitchfork,
picked up the bones with it, put them in a box," &c.
On the same day a coroner's jury was empaneled which
sat from that day (Sunday) until Wednesday. A great
many persons went down on Sunday to view the re-
mains and the place where found. One witness says
"a great number of people went out to where it was
found; it may have been up in the hundreds that went
there that day; they were coming and going nearly all
day, and in crowds from one to eight and more." I
concede that the evidence tended to show an identifi-
cation of this dead body as that of Lilly Gantling by
the clothes found upon it, and by certain peculiarities
of the teeth, but there is not one syllable of evidence
tending to show blood stains upon any article of cloth-
ing found with the body, or upon the oil-cloth here-
after referred to, or any marks of violence upon the
remains, or of any struggles by the deceased, or even
that the body was buried in the mud by human agen-
cies. The coroner's jury sent a message to defendant
to come down and view the remains, but the message
was not delivered. The defendant was, however, in-
formed of the finding of the body, and that it was sup-
posed to be that of his daughter, between two and three
o'clock on Sunday; said he would go down and see the
remains, but did not go until about sundown, when sev-
eral members of the coroner's jury went up to see him.
He was asked to go two or three times by them before

39

he did go, though he did not at any time refuse to go. He and his wife stated to every one that asked them about the matter that Lilly was missing and had been since about the last of July, or for about two months, and stated that they supposed she had run away. They described Lilly's clothes, and the description given applied to those found upon the body. They went to view the remains and stated there was nothing there to prove that the remains were those of Lilly Gantling. On Monday morning an oil-cloth was picked up twenty-five or thirty yards from where the body was found. One witness says "it looked as if it had been dragged a piece and dropped." Another said "I saw the oil-cloth that *was said* to have been found up there on Monday. I saw the place where *it was said* to have lain; it was damp, it was near the body, in about forty yards. I saw some broken bushes between the oil-cloth and the body, I suppose some six or eight extending about half way between them." I concede that the evidence tended to show that this oil-cloth belonged to defendant. Several of the witnesses had never heard that Lilly Gantling was missing until the body was found; while several others had heard of it a month or more previous to the finding of the body; some of them from defendant or members of his family; some of them from other people; but to none did defendant represent that his daughter was not missing, nor was there any evidence of attempts to conceal the fact. There is no evidence that Lilly Gantling mysteriously disappeared. Several witnesses testified that they frequented defendant's restaurant, taking meals there; that Lilly Gantling waited upon them until "about the last of July," or "about the first of August," after which they did not see her any more until the dead body was discovered. No witness pretended to give the exact date of her disap-

pearance, every one stating "about the last of July," or "about the first of August," except one who stated that he went there to board on July 25th, and that "after about a week after I first went there" he never saw her again, and that shortly afterward defendant's wife stated that Lilly had run away.

The alleged confessions were made to Dick Hill, an unlettered negro herb doctor and fortune teller, who "tells a little something in the cards," and Arch Thompson, a witness who had been convicted of larceny, but pardoned. Hill says that on the evening of the day that the body was found he and defendant were in a room together where there was nothing "but a table and a pint of whiskey," and it seems a pack of cards. He says "when we got in the room he said he wanted me to look over some things for him, and I did, and I told him 'you see that card' and he says yes; I says 'you are in trouble, tell me your trouble.' He says 'I killed my daughter; not my wife's child; I got to fooling with her and bigged her. I told her not to tell any one, and when the time came I would send her off.' The card spoken of was a club; it was a spade spot." This was his version on cross-examination; his statements upon the direct are given in the opinion of the court.

Arch Thompson testified that late in the afternoon of the same day he had a conversation with defendant which he relates as follows: "He says I tell you Arch I am in trouble, he says; if I tell you something will you tell it, and I said I didn't know whether I would or not. He said well, I will tell you, and I asked him what was it, and he said I killed my daughter. I said no you didn't. He says yes I did, and I said no you didn't; he said I had it to do, and I said no you didn't; he said I carried her off; Dellege held her hands and I cut her

throat with my razor. Just at this time Peter Davis spoke and we jumped up."

I have stated the evidence developed upon the part of the State thus minutely, omitting no circumstance proved, for the purpose of showing fully the state of the proof relating to the *corpus delicti* when the confessions were admitted. And I may say here that nothing further upon the subject was developed by the evidence given in behalf of defendant or the State's evidence in rebuttal. The question is therefore squarely presented as to whether the *corpus delicti* was sufficiently proven to admit evidence of extra judicial confessions. I am clearly of opinion that it was not, and that a positive rule of law has been violated in admitting them. In this State confessions are not only insufficient to authorize a conviction without other proof of the *corpus delicti*, but they are not even admissible as evidence, until other proof of the *corpus delicti* has been given. The *corpus delicti* is made up of two essential elements in homicide cases. First, it must be shown that a person is dead; second, that his death was caused by the criminal agency of another. There was evidence in this case tending to prove the first element of the *corpus delicti*, *viz*: that Lilly Gantling was dead, but none, in my opinion, tending to show that her death was caused by the criminal agency of another. There were circumstances shown which might or might not according to other circumstances tend to prove this element, but the connecting circumstances are omitted from the proof in this case. A dead body is found in the edge of a swamp in the town of Jasper, within forty or fifty yards of a public road leading into the town. Not one single mark of violence is discovered upon the remains, not one blood stain is discovered upon the numerous garments found upon the body, not one lethal instru-

ment is found, not one sign of a struggle is observed upon the ground or bushes about the place where the body is found. The finding of the oil-cloth did not tend to prove violence toward the deceased. It was not found until Monday, after hundreds of people had been out to the spot the day before without observing it, though from its size (5x7 feet) and proximity to the body it is difficult to see how it could have escaped the observation of so many people if it was there all day Sunday. It bore no signs of blood or other evidence that a murder had been committed. In fact there was nothing in the evidence tending to show when or how it came to be there, or how long it had been there. One witness said that the place where it *was said* to have lain was damp, but whether the surrounding ground was damp or dry is not shown, so that the circumstance furnishes no inference as to how long the cloth had lain there. Besides, this statement of the witness is hearsay merely as he does not profess to know of his own knowledge whether the oil-cloth had lain there or not. Another witness says it looked as if the cloth had been dragged a piece and dropped, but whether this dragging appeared to be of recent occurrence is not stated. The broken bushes between the oil-cloth and the body did not indicate violence. They indicated the passage of some animate body between the two objects, but as it was not shown whether the bushes appeared to be recently broken or not, we can not assume that they were not broken by persons passing around during the coroner's inquest. Besides all this, if we concede that the oil-cloth was carried out there at the time of Lilly Gantling's death and the bushes broken at that time, it does not show that her death was caused by the criminal agency of another. The cloth may have been carried by her for she had access to it as much as

the owner and she may have dragged and dropped it, and she may have broken the bushes between where it lay and her body and yet have died from natural causes or by her own hand. The facts attending the finding of the oil-cloth do not in the least degree tend to prove the second element of the *corpus delicti*, but merely the identity of the defendant. Much stress seems to be laid upon the fact that when found the body was partly covered, and upon the screams heard by Mariah Cobb and the night-watchman. If these circumstances were properly connected by others they would be entitled to weight; but they are not connected so as to raise an inference, but merely a bare suspicion that Lilly Gantling came to her death by violence. The body was found in a swampy place which could not have been dry very long, with holes about in it containing water. Part of the body was sticking out of the mud and the rest was covered. It was, therefore, buried very shallow in the mud, so much so that a pitchfork only was used to uncover it. Whether it was found in a hole which had previously contained water, or on a level spot is not stated. It certainly does not appear that there were any evidences that some person had dug a grave or hole to bury the body in, or that the mud was thrown on the body by any human agency. No digging implement was found there, no evidences of any digging or other preparations for burying or concealing the body, no circumstance to show that at the time the body came there the mud was not soft enough to permit the body to sink beneath it of its own weight. Every circumstance connected with the finding of the body and oil-cloth are entirely consistent with the idea that deceased was a suicide by drowning, or other means, or that she came to her death by accidental drowning or other means, or from natural causes. She was found in the

edge of a swamp near a public road, not very far from her home. A call of nature or a thirst for water may have caused her to leave the public road, and a misstep may have precipitated her into a watery grave, or she may have been stricken with heart failure or some other instantly fatal disease. To prove the *corpus delicti*, the evidence must tend to rebut these reasonable hypotheses, and the evidence in this case does not do so. I do not mean to say the evidence must exclude these hypotheses beyond a reasonable doubt, but it must tend to exclude them.

Now, as to the screams: The testimony of the night-watchman tends to corroborate that of Mariah Cobb; it does not tend to prove more. Mariah Cobb was well acquainted with the voices of defendant and his daughter. She did not recognize them on the night of the screaming. If she who knew the parties could not identify them how can the court and jury do so? How can it be inferred that the screams heard that night proceeded from Lilly Gantling, from the mere fact that her body was found two months afterwards near the neighborhood and somewhat in the direction of the screams, especially when the party who heard the screams could not identify them? Hearing screams of this nature at the particular time on a dark, rainy night was an unusual circumstance it is true, but neither this, nor the unusual circumstance that Lilly Gantling's body was found two months afterwards on the *other* side and northern end of the swamp authorize the deduction that the screams proceeded from her. It is quite apparent that other circumstances must be proved in order to infer that Lilly Gantling screamed that night. She was a waiter at her father's restaurant. She disappeared "about the last of July," or "about the first of August." The screams were heard the latter part of

the week (not Saturday, however,) "about the first of August." I ask what is meant by "about the first of August." The first day of August, 1896, came on Saturday. Mariah Cobb says she did not hear the screams on Saturday. So they must have occurred on the Thursday or Friday night either just before or just after August 1st, viz: July 30 or 31, or August 6 or 7. But there is no circumstance in evidence from which we can fix the precise date. Lilly Gantling disappeared "about the first of August," or "about a week after July 25th." Can the court infer that these expressions mean July 30 or 31, or August 6 or 7, and, if so, which? The argument runs thus: screams are heard at an indefinite time, and Lilly disappears at an indefinite time. These two facts form the basis for an inference that the screams and disappearance occur at the same time, and another inference is drawn from this inference that the screams proceeded from the party who disappeared. Now other facts would authorize the inference drawn if they had been put in evidence, but they were not. For instance, if it had been shown that Lilly was in the neighborhood of the screams, shortly before or after they were heard, or that after that night she was never seen again. But there is no such proof in the record, and none of the witnesses swear that they never saw her at her father's restaurant after the night of the screaming, but many do testify that they saw her there up to "about the first of August," which may have been after the screams were heard. There is nothing from which we can infer that Lilly died on the night of the screaming, or that she died a violent death at any time unless we reason thus: an unascertained person screamed about August 1st. Lilly Gantling disappeared about August 1st, and her remains were found about October 1st, in a swamp about a quarter of a mile

away. The dead person was Lilly Gantling, therefore it is inferred that she is the person who screamed, and because she screamed, we infer she was murdered. I am of opinion that the evidence of the alleged confessions should have been ruled out upon defendant's objection, because there was no evidence from which the jury could reasonably infer that Lilly Gantling came to her death by the criminal agency of another. Pitts v. State, 43 Miss. 472; Smith v. Commonwealth, 21 Gratt. 809; People v. Palmer, 109 N. Y. 110, 16 N. E. Rep. 529, 4 Am. St. Rep. 423; Campbell v. People, 159 Ill. 9, 42 N. E. Rep. 123, 50 Am. St. Rep. 134; Conde v. State, 35 Tex. Cr. App. 98, 34 S. W. Rep. 286, 60 Am. St. Rep. 22; note to State v. Williams, 78 Am. Dec. 252 *et seq.*; State v. Laliyer, 4 Minn. 368.

II. I am equally clear that the evidence was wholly insufficient to support the verdict. By comparing my statement of the evidence in this case with the statement upon the former trial, Gantling v. State, 40 Fla. 237, 23 South. Rep. 857, it will be seen that a much stronger case was made upon the former trial, than upon the present one. If the defendant is guilty as charged, he has committed a murder as unnatural and horrible as has ever been perpetrated in this or any other State, and there is not one mitigating circumstance in his favor. A father begetting a child by his own daughter of less than seventeen years of age, deliberately forcing her along a public road to a place of slaughter, making no attempt to confine her or to prevent her screams, carrying her across or around a pond and deliberately murdering her by cutting her throat with a razor, all because she told of his brutal lust to black and white, could surely claim no recommendation to mercy from any jury who believed him guilty beyond a reasonable doubt. I admit that there were conflicts in the evidence

which it was the duty of the jury to settle, but there were certain rules of law which applied with full force to the case, and against which this verdict stands out in bold relief. The charge of the court is not found in this record, but I assume that the instructions were correct. The rules of law I refer to are as follows: Confessions of the prisoner must be acted upon with great caution. . No matter how full they may be, there must be other evidence of the *corpus delicti*; the jury must not only believe that the prisoner made the confessions, but they must believe the inculpatory parts to be true before they can act upon them; and the jury must be satisfied beyond a reasonable doubt, from all the evidence, of the guilt of the accused. The characters of Hill and Thompson, as shown by their own testimony and that of others, and the contradictory statements they had made, and the improbability of their stories upon the face of them, induce me to place little reliance upon what they say. The State seemed to concede that Thompson was unworthy of credit, for it abandoned that count in the indictment which was based upon the alleged confession made to him—that is, that the killing was done with a razor. I have shown that there was no evidence tending to prove that Lilly Gantling came to her death by the criminal agency of another, and as defendant's confessions alone could not supply that defect, an acquittal ought to have been had. But should I admit that the evidence did tend to prove that element of the *corpus delicti*, then, with the confession in, the whole evidence was insufficient to produce conviction beyond a reasonable doubt. If we assume that the confessions were made, they are not corroborated in any essential particular. Defendant, as a witness, swears that he did not make them, and all the circumstances of the case tend to show that if he made them, they were untrue.

His confession to Hill was that he killed his daughter because he had bigged her and because she told it around to white and black. Not one witness was produced to show that Lilly Gantling had told any one of her condition, or that defendant had ever mistreated her or spoken harshly to her about anything, or that any person except Mariah Cobb ever suspected that Lilly was pregnant. The fact that defendant was a married man; that his wife and children lived in the house with him, the extreme youth of Lilly, the fact that she was defendant's daughter, all go to repel the idea of criminal intimacy between defendant and Lilly. No one supposed Lilly to be pregnant but Mariah Cobb, and she only judged from observation, and gave it as her opinion that Lilly was advanced *two, three or four months*. Common knowledge teaches us that no reliance can be placed upon testimony of this nature, and although many other witnesses were examined who saw the girl daily up to the time of her disappearance, not one of them ventured an opinion that she was pregnant, or even that she had that appearance. The confession to Arch Thompson is even more vulnerable. It was, that defendant killed his daughter; that he had it to do; that he carried her off; that Dellege held her hands, and he cut her throat with a razor. This confession is shown to be untrue by the finding of the body. If Lilly's throat was cut with a razor, and her body then buried with the clothes upon it, why were not blood stains found upon the clothing? No circumstance is shown to account for the absence of blood spots, and their absence can not be accounted for upon this record on any theory other than that the throat was not cut. Not one statement in the confession is corroborated by any reliable evidence. There was no proof from which the jury could legitimately infer the criminal agency

element of the *corpus delicti*, except the confessions which, as I have shown, were incredible, and these confessions do not, in connection with all the other evidence in the case, produce conviction to the mind beyond a reasonable doubt. Again I ask, granting that defendant committed murder, how was it effected? By what instrument was it accomplished? Was it by a razor? If so how can defendant be convicted under the second count of the indictment when the first, charging the murder to have been effected with a razor, was abandoned? If it was effected in a manner and by means unknown, and not by a razor, where is the proof? The circumstances fail to show that the girl was murdered at all. The confession admits the murder, but shows that it was effected with a razor. If the confession is true the defendant was guilty under the abandoned count only; if it was not true he was not guilty under either count. What reason had the jury to reject that part of the confession relating to the razor, and for believing the other? I admit the force of the fact that two juries have found defendant guilty. But, as I have shown, the evidence was not the same upon both trials. And it can make no difference how many verdicts have passed against the defendant, so long as rules of law are violated new trials must be granted, where injury results from such violations; and such I am convinced is the case here, and I think for the error in admitting the confessions, and because the evidence is insufficient to support the verdict, the judgment ought to be reversed and a new trial granted.