# SUPREME COURT

OF THE

STATE OF IOWA

AT

DES MOINES, JANUARY TERM A. D. 1906

AND IN THE SIXTIETH YEAR OF THE STATE.

STATE OF IOWA, Appellee, v. MARTIN WESTCOTT, Appellant.

**Criminal law:** CONFESSIONS: CHARACTER OF SAME: SUBMISSION OF
1 ISSUE. Where the evidence is in conflict and the court in
doubt as to the voluntary character of a confession, the issue
may be submitted to the jury. Evidence reviewed and held
to warrant a submission of the issue.

**Corpus delicti:** SUFFICIENCY OF PROOF. A conviction for murder
2 cannot be had upon an extrajudicial confession unless accompanied by other evidence that a crime has in fact been committed by some one, but the independent evidence need not
of itself be sufficient to establish beyond a reasonable doubt
the commission of the crime.

Same. While the corpus delicti must be established beyond a reasonable doubt, it may be shown by circumstantial as well as direct evidence.

Corpus delicti: EVIDENCE. On a prosecution for murder, the independent evidence of the corpus delicti, when considered in connection with defendant's confession, is held sufficient to authorize a submission of the case and to support a verdict of guilty.

*Appeal from Cerro Gordo District Court.*— HON. CLIFFORD P. SMITH, Judge.

TUESDAY, JULY 11, 1905.

REHEARING DENIED FEBRUARY 21, 1906.

DEFENDANT was indicted for the crime of murder. Upon trial to a jury he was convicted of manslaughter, and from the judgment imposed on the verdict he appeals.— *Affirmed.*

*Blythe, Markley & Rule* and *W. E. Lamb,* for appellant.

*Charles W. Mullan,* Attorney General, and *Lawrence De Graff,* Assistant Attorney General, for the State.

DEEMER, J.— The state claims that the defendant struck and threw or pushed one George Logue, a barber, through a window of his shop in the second story of a building in the town of Hanlanton, resulting eventually in the death of him, the said Logue. Aside from a confession said to have been made by the defendant, wherein he stated, among other things, that he had trouble with Logue; that Logue was beating him with a chair, and that he struck Logue with his fist or with a quart whisky bottle, and knocked him out through a window — the evidence is wholly circumstantial, and in and of itself insufficient to justify a conviction.

It is claimed that this confession was not admissible in evidence, because abstracted from defendant through fear, promises, and inducements held out to him to secure him to make it. Further, it is argued that the *corpus delicti* was not sufficiently established; and error is assigned on some of the instructions given by the trial court, and upon its refusal to give certain of those asked by the defendant.

The question most extensively argued is the inadmissibility of the alleged confession. This matter was finally submitted to the jury upon the testimony adduced regarding the character thereof. If the matter was properly submitted to the jury, no fault is found with the instructions relating thereto.

1. CRIMINAL LAW: confessions; character of same; submission of issue.

That it is proper to submit the question of the character of a confession to a jury when there is a conflict in the evidence and the court is left in doubt on the issue, is the rule in this state. *State v. Storms,* 113 Iowa, 390. That case treats the subject of confessions quite fully, and we shall have occasion to refer to it again. Should we find that the court was justified in admitting the confession upon the preliminary showing made to it, then, of course, no prejudice resulted to the defendant from the submission of the matter to the jury. We shall first take up this confession.

Logue died on the afternoon of December 12, 1903. The coroner of the county was notified, and he at once came to Hanlanton, impaneled a jury, subpœnaed witnesses, and proceeded with his inquisition. Defendant was seen in company with the deceased during the day he received his injuries, and he was summoned, with other witnesses, and placed upon the stand. His testimony was very contradictory and unsatisfactory, and he acted, as the coroner said, " as if the whole matter were a huge joke." There is some conflict in the testimony as to what was said and done that evening, but all agree that at the conclusion of Westcott's examination the coroner told the sheriff, who was

there present, to "take this witness, and have him back here in the morning at 8:30 o'clock." The sheriff then went with the defendant to a hotel, and after partaking of a lunch together the sheriff handed his revolver and knife to a deputy sheriff in defendant's presence, and he and the defendant retired to a room engaged by the sheriff to pass the night.

While preparing for bed, the sheriff said to the defendant, among other things: "How foolish of you. You remember everything else, but when it comes to the circumstances of the murder your mind is a blank. Why don't you explain everything? Now, as a friend of yours, I want to know. You can tell me. I cannot see how you could kill poor Logue." To this the defendant answered: "I must have had it in for him. You see he interfered with me when I tried to lick Martin Lewis." The sheriff then went on further, and stated: "Martin, tell me all about it. Supposing three or four men would say they saw you do it. What would you say to that? Clear your mind, and let the world know that you are not a man to do anything like that and then deny it." The sheriff also testified as follows: "Defendant by this time had got over in bed. I think I made some remark whether he would care if I put handcuffs on him. Defendant said something like that was all right. I put one handcuff on him and one on myself, and I rolled over in bed and went to sleep."

Upon awakening the next morning, the sheriff, while still in bed with defendant, removed the handcuffs, and after they had walked around town for a while the defendant finally said, "I have thought over that matter seven thousand times, and I believe I will make a clean breast of the whole thing." This was the first time the matter had been mentioned since the defendant and the sheriff retired the night before. The sheriff answered, saying, "That's right; tell the whole truth, and I will respect you." Defendant then said, "What about the story I gave them last

night?" (referring to his testimony before the coroner's jury), and the sheriff said: "What's the difference? Probably you were excited. Probably you remember some things better this morning. If so, tell them so."

They then proceeded to the barber shop, where the inquest was being held, and defendant remarked on the way there: "What about the blind pig? Shall I tell about the blind pig?" To which the sheriff replied, "Yes." Arriving at the room where the inquest was being held, the sheriff told the coroner and the county attorney, who were present, quoting from appellant's brief: "That defendant wished to see them alone. And after the coroner and county attorney had stepped into a room the sheriff stated that Martin, the defendant, was going to tell all about it, and after stating that the coroner excluded all persons from the room except the county attorney, the sheriff, and members of the jury, and they then proceeded to the taking of Westcott's statement." Before starting, the county attorney told Westcott that he need not incriminate himself, but did not then say to him that he could refuse to answer and that his silence would not be used as evidence against him. After making this statement, the county attorney proceeded to ask questions of the defendant, and during the course of the examination, when the defendant would hesitate, the sheriff would say to him, "Martin, tell the truth," or "Tell the truth, Martin." This the sheriff did a number of times when the defendant seemed to hesitate. After the close of the examination, which was written down by the coroner, Westcott was asked to sign the statement, and after hesitating for a time — one of the witnesses saying that he seemed to be compelling himself to sign — finally did so.

The sheriff admits that in making the remarks he did to the defendant he was endeavoring to get him to confess; but there is no testimony that the sheriff made him any promises, or that he even said that it would be better for him if he did confess. There is some testimony to the

effect that the officer suggested a theory of self-defense to the defendant; but, if he did, this was a mere trick, which will not in itself exclude the confession. It abundantly appears that defendant was told not only once, but many times, that he need not answer any questions which would tend to incriminate him, or tend to connect him in any way with the killing of Logue. Before he signed the statement, he was again advised that he did not have to sign it, and that, if he did, it would be used against him in criminal proceedings. At the examination held the previous evening he was not so informed, for the reason, as we suppose, that he was not then charged with any offense, and at most there was a mere suspicion of his connection with the crime.

This is the substance of the testimony as to how the confession was obtained. All statements made by the defendant on the evening of December 12th were excluded by the trial court as having been made under compulsion; and the jury was told that this compulsion was presumed to continue, and that his subsequent statements were involuntary, unless it were shown that the influence was removed, and defendant's condition of mind changed, before the subsequent statements were made. The burden was also placed upon the state to show that the statements made by defendant were free and voluntary.

Under the rule announced in *State v. Clifford*, 86 Iowa, 550, the trial court was correct in excluding the statements made by defendant on the evening of December 12th, and the only question which arises on this appeal is, was there error in submitting to the jury the question of the character of the confession made the next day?

We think there was no error here of which defendant may justly complain. While the defendant may have been under unlawful arrest, this did not of itself make the confession involuntary. There were no threats or duress sufficient to destroy the voluntary character of the confession.

State v. Storms, *supra*.   The case in this respect turns upon whether or not there were any promises or inducements held out by the sheriff sufficient to destroy the voluntary char-acter of the statements.   They were not, in our judgment, sufficient to induce the defendant to make an untrue state-ment.   The most that can be said in any event is that reason-able minds might differ regarding the inferences to be drawn from the testimony.   In such cases the question is for a jury.   We have declined to follow the broad rule laid down in *Bram v. U. S.,* 168 U. S. 532 (18 Sup. Ct. 183, 42 L. Ed. 568).   See State v. Storms, *supra*.   As sustaining our con-clusion that there was no error in submitting the question of the character of the confession to the jury, see *Sparf v. U. S.,* 156 U. S. 51 (15 Sup. Ct. 273, 39 L. Ed. 343); *People v. Barker,* 60 Mich. 277 (27 N. W. 539, 1 Am. St. Rep. 501); *State v. McLaughlin,* 44 Iowa, 82; *Hopt v. People,* 110 U. S. 574 (4 Sup. Ct. 202, 28 L. Ed. 262); *State v. Novak,* 109 Iowa, 717; *State v. Peterson,* 110 Iowa, 647; *Com. v. Myers,* 160 Mass. 532 (36 N. E. 481).   Be-fore making the statements on the morning of Decem-ber 13th, defendant was fully advised as to his rights, and there were no threats or promises made at that time.   Ap-parently what he said and did was entirely voluntary. *Teachout v. People,* 41 N. Y. 7; *State v. Carroll,* 85 Iowa, 1; *State v. Briggs,* 68 Iowa, 424.

II.   The next point is insufficiency of proof of the *corpus delicti*.   Section 5491 of the Code provides that " the confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied

**2. CORPUS DE-LICTI: suffi-ciency of proof.** with other proof that the offense charged was committed."   What is meant by this is that a conviction cannot be had upon an extrajudical confession, unless it be accompanied with other proof (or evidence) that a crime has in fact been committed by some one.   De-fendant's contention is that there was no other proof; that all the other testimony was as consistent with the theory of

accident as of homicide. Certain of the instructions with reference to this matter are also criticised, and it is argued that the *corpus delicti* must be proved beyond a reasonable doubt by evidence distinct from and independent of the confession. There is some conflict in the authorities upon these propositions.

The trial court instructed practically in the language of the statute, but the defendant asked an instruction to the effect that the *corpus delicti* must be proved by evidence aside from and independent of the confession. Much is made by counsel of the phrase in the statute " other proof." This is said to mean something more than mere corroboration; that proof means something more than evidence. The argument is plausible, but not sound. The statute says the confession must be " accompanied with other proof " that the offense was committed, and we think it does no more than announce the general rule prevailing in this country that a confession must be corroborated by other testimony. This corroborating testimony need not of itself, and independent of the confession, be such as to prove the commission of a crime beyond all reasonable doubt. It is sufficient, in our opinion, if, when considered with the confesson, it establishes beyond all reasonable doubt that a crime was in fact committed by some one. *People v. Jones,* 123 Cal. 65 (55 Pac. 698); *Gantling v. State,* 41 Fla. 587 (26 South. 737); *Flower v. U. S.,* 116 Fed. 241 (53 C. C. A. 271); *Ryan v. State,* 100 Ala. 94 (14 South. 868). In England and in some of the states it appears that no corroboration is required, but the matter is regulated by statute in this jurisdiction, and we think that statute requires nothing more than the corroboration we have stated. While the question has not heretofore been definitely considered by us, the cases have generally recognized this rule. *State v. Feltes,* 51 Iowa, 495.

While the *corpus delicti* must be proved in this state beyond a reasonable doubt, as the trial court instructed, yet

it may be established by circumstantial as well as by direct evidence.  *State v. Keeler,* 28 Iowa, 551.

3. SAME.

There was no error in the instruction given by the trial court regarding this matter, and the instruction requested was properly refused.

III.  But it is said that there was no evidence aside from the confession of the *corpus delicti.*  That Logue was found underneath the window of his barber shop on the evening of December 11th, suffering from

4. CORPUS DE-LICTI: evidence. wounds from which he afterwards died, is so well established as not to be challenged.  Defendant claims, however, that his theory of accident was not sufficiently disproved; in other words, that the *delicti* was not made out by the quantum of evidence required.

In his confession defendant stated that he knocked or pushed Logue through a window from which a pane of glass had that evening been broken.  There was other testimony to the effect that defendant had had a difficulty with a man by the name of Lewis in the barber shop during the afternoon of the day when Logue received his fatal injuries; that he (Logue) interfered; that there was scuffling heard in the room at or about the time when the state claims the crime was committed.  Defendant stated at the time he had his trouble with Lewis that he could lick both Logue and Lewis. A man was seen in the barber shop at or about the time Logue received his injuries, whose outline bore a strong resemblance to that of defendant.  Just before Logue fell or was thrown from the window, he came downstairs, obtained a match, and said there would "be a rough light up." Prior to that time the lights in his shop were out, and upon Logue's return they were immediately lighted.  Defendant was seen with Logue as late as eight o'clock in the evening, and Logue's body was found at about eleven at night on the ground underneath the window of this shop.  From eight until about 9:30 o'clock p. m. defendant's whereabouts are not very consistently accounted for.  The injuries on Logue's

face and body were such as that an accidental fall from the window will not account therefor. His body was not at a place where it would naturally have been found had he accidentally fallen from the window. It was east of the east side thereof. He was found lying on his face and stomach, with his right hand in his trouser's pocket, and with his left under his body. His body was stretched out at full length with his extremities toward the northwest. His face and head were swollen and discolored. There is a conflict in the testimony of the experts regarding the nature and extent of his wounds, but a jury was authorized to find that they could not have been made by a fall from the window alone. The wounds upon the head could well have been produced in the manner defendant said he caused them, and, if so, the position of Logue's right hand in his trouser's pocket is accounted for. Had he fallen, neither of his hands would likely have been in his pockets. This, with some other testimony, which need not be set out, to our minds furnishes enough corroboration of the confession to justify the submission of the case to a jury, and to sustain a verdict of guilty at its hand.

Some other points are argued, but they are not of sufficient importance to demand separate consideration.

We have examined the record with care, and find no error. The judgment is therefore *affirmed.*