ESTEVAN AND RUPERTO CONDE v. THE STATE.

*No. 615.     Decided June 29th, 1895.*

1. **Murder—Corpus Delicti—Confession.**

It is essential to any degree of culpable homicide. (1), That the deceased should be shown to have been killed. And (2), That this killing should have been proved to have been criminally caused. Unless the corpus delicti in both respects is proven a confession by the accused is not, by itself, sufficient to sustain a conviction.

2. **Fruits of Crime Found in Possession of a Co-Conspirator—Charge Limiting Evidence.**

On a joint trial for murder, where evidence was admitted of the finding of property, belonging to deceased, in possession of one of the defendants, about a week after the homicide, and the other defendant was not present, and is not shown ever to have been in possession of the property. Held: Error for the court, in the charge, not to limit this evidence to the defendant who was thus found in possession of the property. Acts and declarations of a co-conspirator, after the consummation of the conspiracy, are admissible only against the party doing the act or making the declaration. Citing, Armstead v. State, 22 Tex. Crim. App., 51.

DAVIDSON, JUDGE, dissenting.

3. **Murder—Charge Upon in Second Trial after Defendant has been Acquitted of Murder of the First Degree.**

When on a trial for murder of the second degree after defendant had been acquitted of murder of the first degree on a former trial, the court charged the jury, "You are instructed, when an indictment charges murder upon implied malice alone, and the evidence establishes, or tends to establish, express malice as a fact, it is not to be understood that such proof would, on the one hand, be incompetent, nor on the other, that it would create a variance from the allegations in the indictment, but such evidence, notwithstanding it shows express malice, would in such case, be sufficient to warrant a conviction for murder in the second degree, since express malice comprises and embraces implied malice just as murder of the first degree comprises and embraces murder of the second degree." HENDERSON, JUDGE, holds the charge radically wrong, inasmuch as it makes the party liable to be convicted of the crime for which he has been acquitted. The majority of the court, however, dissent from this proposition. DAVIDSON, JUDGE, following, Fuller v. State, 30 Tex. Crim. App., 559.

**4.  Murder—Corpus Delicti—Evidence Insufficient.**

See evidence, stated in the opinion, which the court holds insufficient to establish the corpus delicti on a trial for murder.

APPEAL from the District Court of Nueces.    Tried below before Hon. JOHN C. RUSSELL.

This appeal is from a conviction for murder of the second degree, the punishment assessed against each of the appellants being five years imprisonment in the penitentiary.

This is a second appeal in this case.    See, Conde v. State, 33 Tex. Crim. Rep., 10.    The facts will found sufficiently stated in the former and present opinions.

No briefs have come to the hands of the Reporter.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellants were tried and convicted at the December term, 1894, in the District Court of Nueces County of the offense of murder in the second degree, and their punishment assessed at five years confinement in the penitentiary.    The indictment in this case was originally presented in the District Court of Cameron County. A trial was had in said court, and the defendants convicted of murder in the second degree.    An appeal was prosecuted to this court and the case was reversed because of the failure of the court to charge on accomplice testimony, and because the court improperly admitted the opinion of a witness as to the cause of the death of the deceased. (33 Texas Crim. Rep., 10.)    After the case was sent back the venue was changed to Nueces County.    A trial thereof was had in December, 1894, which resulted in the conviction of both of said defendants for murder in the second degree, and the punishment of each assessed at a term of five years in the penitentiary, and from the judgment and sentences in said case the defendants prosecute this appeal.    It appears that the parties were all Mexicans, and that the defendants lived with their father, Gregoria Conde, in Cameron County, at the time of the alleged homicide, and also that the deceased, Francisco Andes, was staying at Gregoria Conde's.    The last time the latter was seen alive was on the 12th of March, 1893, and within a few days thereafter, (not exceeding a week) the evidence shows that the body of said Andes was buried in a dense thicket, but a short distance from Gregoria Conde's house.    The only witness upon this latter point is Celso Roman, who testified substantially, "that he lived on a ranch not far from where the defendants lived; that about the 12th day of March, 1893, Estevan Conde (one of the defendants) came to my house at the Prado ranch and asked me to go with him to 'Santo Teresa' (the ranch or place where defendants lived).    This was about half-past 10 o'clock in the morning.    I mounted my horse and accompanied him.    After going some distance we met Ruperto Conde (the other defendant, and who is

a brother of Estevan). He was on foot, and coming from the direction of the Santo Teresa ranch. Ruperto asked Estevan, 'Have you got him?' Estevan answered 'Yes.' Ruperto then mounted behind Estevan. Ruperto wore a knife and Estevan a pistol. Estevan then said, 'Come on, let us go.' I asked, 'Where are you going?' Estevan answered, 'We are going somewhere.' I then demanded to know where they were going to take me. Estevan then said, 'We are going to bury Francisco Andes.' We then continued on the road we were traveling until we arrived at a place four or five hundred yards from Santo Teresa, where we turned off the road and entered a path. We traveled this till the woods became too thick for the horses to pass through. We then dismounted, tied our horses, and made our way on foot through a very thick brush until we arrived at a very small opening, where the body of Francisco Andes was lying. His head and shoulders were entirely covered with a coarse white cloth; the cloth was bloody. I did not remove the cloth, nor did I see his face. I knew it to be the body of Francisco Andes by the sandals and pantaloons. I did not see any wounds upon the body. There were besides the body a spade and an iron bar with which to dig the grave. Estevan showed me the tools and told me to dig the grave, which I did, loosening the ground with the bar, while Ruperto threw out the dirt with the spade. We dug a hole about a foot deep, whereupon Estevan and Ruperto lifted the body and placed it in the hole. I then covered the body with earth, filling the grave. When I had finished, we gathered up the tools, and returned to the place where we had left our horses. As we rode away, we met Gregoria Conde, who was on horseback. He said to Estevan, 'Have you finished the job?' Estevan answered, 'yes.' Then Gregoria turned towards me, and placing his hand upon his pistol said, 'Be very careful about this; if anything of this becomes known I or my boys will injure you.' I then rode away and returned to my home." This witness, according to his testimony, four days after this occurrence rode some eighteen miles and told Mr. White, who was also a witness, what had occurred, as above stated, and in a short time thereafter he left the vicinity and went over into Mexico to visit his father, as he says. The sheriff in a few days hearing of the matter and that Roman could tell him in regard to it, went into Mexico and sought out the witness, whom he persuaded to come across the river into Texas, and point him out the grave where they had buried Andes. The body was exhumed and an inquest held. The corpse was identified as that of Francisco Andes, but no wounds or marks of violence were discovered. And the cloth, spoken of by the witness Roman, was found upon the body; and the sheriff stated, "that it had a black substance like clotted and dried blood on it." We have thus quoted fully from the testimony of Roman, as the State's case depends upon his evidence. The questions presented for our consideration are:

1. Does the evidence in the case establish the corpus delicti? By this we mean, the body of the offense, not only that a dead body has

been founɑ and identified, but also the fact that the deceased came to his death by some criminal means or agency. As said by Mr. Wharton (see Wharton on Hom., sec. 641), "It is essential to a conviction for any degree of culpable homicide, first, that the deceased should have been shown to have been killed, and, secondly, that this killing should have been proved to have been criminally caused. * * * * Unless the corpus delicti in both these respects is proven, a confession by the accused is not by itself sufficient to sustain a conviction." And see Lightfoot v. State, 20 Texas Crim. App., 77; Mary Harris v. State, 28 Texas Crim. App., 308. The indictment in this case is in two counts; in the first it is charged that defendants killed the deceased by stabbing him with a knife; and in the second that they killed him by some means and with some weapon unknown to the grand jury. This gave the court, in trying the case, the greatest latitude in permitting evidence to show that deceased came to his death by some criminal means; but in this respect the testimony utterly fails to establish with that degree of certainty which the law requires, that the deceased, Andes, came to his death by any criminal means. We have already quoted from the record all that is disclosed as to the manner or means of his death, and the most that can be gathered from it is that the corpse of Andes was seen by the witness, Roman, after his death, and he assisted in burying him. He did not see his face; he saw no wounds on his person, or other mark of violence. How long he had been dead, whether his body was stiff and cold or not, we are not told. A coarse, bloody cloth over the neck of the deceased, and the unusual circumstances attending the interment of the dead body are all the indications of violence or foul play that the testimony affords. These facts are unquestionably suspicious; but even if they came from a witness of the most unimpeachable character, could we say that the proof was plenary of the "factum propandum" in this case, to-wit: that the deceased came to his death by some criminal means or agency? The bloody cloth is all that we have that would indicate violence, but this is not inconsistent with other causes that might have produced the blood.. We are not informed how fresh the blood was, and it may have been from some animal, and the cloth used by the Mexicans for the purpose of interment, or it may have been the blood of the deceased coming from his mouth or his nose, and yet his death may not have been occasioned by violence, but have occurred from natural causes. And this view is strengthened when, after the body was exhumed, no marks or indications of violence were found on it; the body was then in an advanced state of decomposition, but the bones were all examined and no broken bones or marks of violence were found. In a Mississippi case, where the evidence was that the circumstances of deceased's death and the state of his body indicated poison by stramonium or Jamestown weed, but it was shown that the same symptoms might have been caused by a congestion of the brain or stomach or heart, although the defendant confessed that he had poisoned the deceased with Jamestown weed, the evidence was held not sufficient

to authorize a conviction.  See Pitts v. State, 43 Miss., 472; and in our opinion, the evidence in this case was not of that character to justify the jury in finding that corpus delicti had been proven.

2.   It was also objected in this case, that the evidence of the sash of deceased having been found in the possession of Estevan about a week after the homicide, and also that the gun of deceased was sold by Gregoria in the presence of Estevan some time after his death, should have been limited in the charge of the court to Estevan alone, and that such evidence could not possibly affect Ruperto.   The evidence does not disclose any motive for the killing of Andes, and the fact that he was living at Conde's house would leave the possession of his personal effects entirely consistent with their innocence of his murder, unless the motive for his taking off should appear to have been robbery or gain.   But, conceding that the testimony was properly admitted as evidence tending to corroborate the accomplice Roman, the question is, how could it affect Ruperto, who was not present at the time, and is not shown to have been in possession of either the sash or the gun.   When this case was before us on a former appeal, we were inclined to the view that the possession of this property by one of the defendants was a criminative circumstance that could be used against both, and we so held.   But on more mature reflection, in our opinion, it should only have been admitted as to the defendant, Estevan, and the court in its charge, should have limited its effect to him alone.   The authorities place the acts of one conspirator after the purpose or object of the conspiracy has been consummated on the same plane as his declarations, and such acts or declarations are admissible only against the party doing the act or making the declaration.   Armstead v. State, 22 Texas Crim. App., 51.

3.   The court also, in its charge to the jury, instructed them as follows:   "You are instructed where an indictment charges murder upon implied malice alone, and the evidence establishes or tends to establish express malice as a fact, it is not to be understood that such proof would on the one hand be incompetent, nor on the other that it would create a variance from the allegations in the indictment; but such evidence, notwithstanding it shows express malice, would, in such case, be sufficient to warrant a conviction for murder in the second degree, since express malice comprises and embraces implied malice, just as murder of the first degree comprises and embraces murder of the second degree.   In this, while no exception was made to it, we believe that the court committed an error.   We are aware that in the case of Fuller v. State, 30 Tex. Crim. App., 559, this court drew a distinction between that case and the Parker case in 22 Tex. Crim. App., 105.   In the Parker case, the defendant was convicted under an indictment charging him with murder of the offense of manslaughter.   Defendant in that case had previously been convicted of manslaughter and a new trial granted.   In his charge to the jury on the last trial, the judge fully explained murder in the first and second degrees and manslaughter, but told the jury that defendant was on trial for manslaughter, and that he could not be convicted

of a higher grade of homicide than manslaughter, but that if they believed ·from the evidence that he was guilty of either murder of the first or second degree or of manslaughter, they would find him guilty of manslaughter. Judge Wilson denounced this as error. In speaking of the charge, he says: "Defendant had been acquitted of murder, and this acquittal was a bar to any further prosecution for that offense, and yet the jury are told that if the evidence shows the defendant to be guilty of murder, that they may punish him for said offense, not by finding him guilty of murder according to the evidence, but by calling his offense manslaughter and finding him guilty of that offense. In other words, the jury are told that, although defendant has been acquitted of murder and can not be punished of that offense eo nomine; yet if they believe from the evidence that he did commit murder they may call it manslaughter and punish him as for that offense. It seems to us that this doctrine, if correct, would deprive the defendant in a great measure of the benefit of his acquittal of murder. He would still be punishable for an offense of which he had been acquitted, which would be a result which the law does not contemplate or tolerate. In the Fuller case, Judge White recognizes the rule laid down in the Parker case as correct, as applicable to that case, but limits the rule to a case where a party has been previously convicted of manslaughter and is again put on trial. He says: "A party charged alone of manslaughter could not be convicted upon evidence which would show murder, and not manslaughter, for though manslaughter be embraced in the charge of murder, yet they are two entire, separate and distinct offenses. Murder is predicable upon malice, either express or implied. Malice is not a constituent element of manslaughter, and manslaughter is predicable upon there being adequate cause occasioning the voluntary homicide. In such a case as Parker's, it was clearly radical error for the court to charge as was done. The rule is otherwise, as between murder of the first and second degree, where the party is on trial for murder in the second degree." We are unable to see the cogency of the reason for a distinction between the character of case, as stated by the learned judge in the Fuller case, and an inspection of the cases cited will fail to show that the question of former acquittal was invoked in the case. Section 14 of our Bill of Rights provides that "No person for the same offense shall be twice put in jeopardy of life or liberty; nor shall a person be again put on trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction." And this section is alike applicable to all offenses in which life or liberty are involved. Murder of the first and second degrees have some essential elements in common, but they are none the less distinct offenses with different punishments provided. The lines between two offenses are sometimes shadowy, and so with murder of the second degreee and manslaughter. They have essential elements in common, and it is sometimes exceedingly difficult to mark the distinction between the two offenses. But they are nevertheless dis-

tinct offenses, and yet it is insisted that the constitutional guarantee shall be available when the prosecution is for manslaughter, after a former acquittal of murder of the first and second degrees.    But if the prosecution is for murder of the second degree, after an acquittal of murder of the first degree, the constitutional guarantee is of no avail.    Mr. Bishop, Crim. Law., Vol. 1, Sec. 1004, in speaking of this constitutional right as involved in a grant of a new trial, says: "The waiver of the constitutional right implied in an application for a new trial, is construed to extend only to the precise thing concerning which relief is sought," and he shows that where one count embraces several offenses as murder, which embraces degrees as also manslaughter, and there is a finding of a minor grade of offense, and the verdict is silent as to other grades by the weight of authority, this is an acquittal of the higher grades.    Long since this has been the doctrine of the courts of our State. See Jones v. State, 13 Texas, 168; State v. Belden, 33 Ia., 124; Brennan v. People, 15 Ill., 518.    In our opinion, this constitutional guarantee is applicable to all offenses, and where a defendant has once been put on trial for an offense which embraces different degrees, and has been acquitted by a jury of the higher degree, he cannot be again put on trial for such higher grade, and it is the duty of the court to so inform the jury.

For the errors herein discussed, the judgment of the lower court is hereby reversed and the cause remanded.

*Reversed and Remanded.*

DAVIDSON, JUDGE, dissenting.—I concur in that portion of the opinion holding the corpus delicti is not sufficiently proved.    I dissent from that part of the opinion holding the trial court should have limited in his charge the effect of the testimony showing that Estevan Conde was in possession of deceased's sash and that Gregoria Conde, in the presence of Estevan, sold deceased's gun.    Both of these facts occurred just after deceased's death and was evidence to prove the main fact and not a collateral issue.    The same evidence relied upon to connect Ruperto Conde with the death of deceased was relied on to connect Estevan and Gregoria with said death.    The possession of the sash by Estevan and of the gun by Gregoria were not acts, declarations or conduct of conspirators transpiring subsequent to the crime, but were physical facts, independent and inculpatory in their nature, and were fruits of the crime.    The sash and gun were property of the deceased and in his possession just prior to his death.    Pierson v. State, 18 Tex. Crim. App., 524; Clark v. State, 28 Tex. Crim. App., 189; Conde v. State, 33 Tex. Crim. Rep., 10; Pace v. State, 20 S. W. Rep., 762.    This evidence was as cogent against Ruperto as against either Estevan or Gregoria and was pertinent to prove the main fact and not a collateral issue.    Same authorities.    Foster v. State, 32 Tex. Crim. Rep., 39.    I further dissent from that portion of the opinion overruling Fuller's case, 30 Tex. Crim. App., 559.    I cannot add anything to the reasoning of Judge White in that case, and I adopt it as the reasons for my dissent on this question.

JUDGE HURT, Presiding Judge, concurs with the opinion of Judge Henderson in regard to the first two propositions, but not as to the latter.