McCORD, J.
Appellant was indicted and convicted for burglary and his punishment assessed at confinement in the penitentiary for two years. At the February term, 1910, of the district court of Hamilton county there was returned a hill of indictment against Will Probst, John Bowen, and Ed. Marvin, charging them with burglary committed on the 28th day of January, 1909, by force breaking into a house under the control of one W. M. Chaney, with the fraudulent intent to take, carry away, and steal out of said house personal property therein situated. A severance was asked and granted and the defendant John Bowen was placed upon trial, resulting in his conviction, as aforesaid.
On the night of January 28, 1909, the Farmers’ & Merchants’ State Bank located at Carlton, Hamilton county, was burglarized. The parties entered said bank and by the use of glycerine, or some other explosive, blew open the safe of the bank and robbed it of some $9,000 or $10,000 consisting of gold, silver, and paper currency of different denominations, there being $100 bills, $20 bills, $10 bills, $5, etc. Some of the money was national bank currency, some gold certificates, and some silver certificates. Some miles from the place of the robbery there was discovered where some parties had recently been. There was a bottle marked Jersey Cream Whisky, a tin can or two marked Van Camp’s Pork and Beans, and a number of cigarette stumps, also crumbs of bread, showing that the parties had been there some little time and had eaten a lunch. It was not known who committed this offense. It was done some time during the night of the 28th of January, as before stated. Also at this place was found a 84-40 cartridge and some soap. Around the place where the burglary was committed, there was a pickax, crowbar and sledgehammer, and a great many other tools scattered over the front of the walk; also soap was found around on the wall and one exploded cartridge. There was a barricade made of wire netting, of rolls of wire setting up on the end, on the outside of the door. It may be stated that soap is used in filling the crevices when explosions of this character are made. The testimony shows that the three parties indicted in this case were companions, and that they made a saloon in Fort Worth near what is termed “Hell’s Half Acre,” located in a disreputable part of the city, their rendezvous, and this saloon was conducted by a man they called “Frenchy.” Over this saloon was a place known as the Hoffman Hotel or flats. These parties were not noticed around their usual haunt on the 27th and 28th of January. On the night of the 29th of January they were noticed in Fort Worth, and the defendant was seen on the next morning, or some time thereafter, to deliver a large roll otf money to “Frenchy,” the saloon keeper. The proof showed that Marvin was in Kansas. City about the middle of January; that he disappeared and again showed up there about the 5th of February, and, after getting his mistress, returned with her the next day to Fort Worth. The testimony further shows that when he appeared in Kansas City he had a large roll of money and in the wad were two $100 bills. He supplied his mistress with money to make several purchases, and then they returned to Fort Worth. The proof further shows that Marvin, in the early part of February, 1909, deposited in the Texas State Bank somewhere between $700 and $9,00. The proof shows that along about the 5th or 6th of February, Bowen, with a woman he called his wife, Probst, with his mistress, and Marvin, with his mistress, .all went out and rented a house in South Fort Worth on what is called La Avenue. Low-ry testified that the first time he ever saw Bowen was about the 20th of January on Sunday evening, when he came and wanted to get something to eat; that on the 29th day of January Marvin and Bowen, the defendant, came to his' store to pay a little bill that their wives had made; that they paid him with a $20 bill, the amount of the purchase being less than $1; that this was on Friday evening; that from Friday evening until Sunday morning he received from Marvin and Bowen 15 $20 bills; that every time they made a purchase, none of which exceeded a dollar, they would give him a $20 bill in payment; that some of the purchases did not amount to more than 10 cents. On the morning of the 13th day of February, 1909, officers arrested Will Probst and Ed. Marvin at the house on La Avenue. Bowen was not arrested, but on the next morning, the officer stating that he did not know Bowen was there at the time, he arrested the other two. The officer says that he found, out under the barn, three pistols wrapped up in some papers; that* under the back porch there was a lot of rubbish, such as tin cans and wood. That he also found wrapped up in the tail of an undershirt a lot of cartridges; that the pistols were all wrapped up in newspapers; that there were some three or four hundred cartridges found on the *258 back porch; that one of the girls staying at the house said she took the pistols and cartridges after the arrest of Marvin and Probst and hid them at the places they were found. It may be stated that when the officers arrested Probst they did not arrest Marvin, but he followed along, and that when they got nearly to the City Hall Pro-bst started to give Marvin his diamond and Marvin started to get off, when they arrested Marvin, and that when they searched them $58 were taken off of Probst and $30 off of Marvin; that Marvin had on a diamond ring and diamond pin. Probst had on a diamond ring. As before stated, these people were not shown to have any visible means of support. They had been missed from Port Worth about the time of this robbery; they hung around this saloon in this disreputable portion of the city. Shortly after the robbery they were seen with a groat deal of money, sporting diamonds, and a large roll of money was deposited in a saloon by one of them, to wit, Bowen, Probst being present when this was done. Marvin made a large deposit in the bank; they gather their mistresses and go out to South Port Worth and rent a house; they are seen within two days exhibiting money of large denomination; . they are making-small purchases and passing $20 bills to be changed. All the facts and circumstances show that they have recently come into the possession of money.
The state proved by Etherton that on the evening previous to the robbery of the Carlton bank he saw three parties who were strangers in the little town -of Alexander, some 10 miles north of Carlton; that they were down south of the depot some 30 or 40 yards; that there were two large men and one small one; that he did not see the men’s faces; that they were going south when he saw them; that they were all dressed in dark clothes and all had on black hats. He states that he did not consider them to be ordinary laboring men; that they did not look like laboring men; that the two large men held themselves up straight and erect and looked a little above the average man, and attracted witness’s attention; that he noticed them until they traveled some four or five hundred yards. This witness further says that he had noticed the three men who are charged with the robbery of the Carlton bank; that their names are Marvin, Probst, and Bowen, the defendant now on trial. The witness further says: “I will say that the two larger of these men appear in size and make-up to a letter wfcth the two larger men that I saw in Alexander that day, but this man Bowen to my knowledge and belief is smaller than the men I saw. The witness further testified that two of the men had bundles.” On cross-examination the witness said: “I could not say that the smallest one of those men -was smaller than this defendant, but it seems that he was. I could not say he was taller. I could not say that he was heavier set. I would not say that the defendant is a smaller man than that smallest man was. I say that this man looks too small for the man I saw there that day.”
Andy Rogers testified that he lived at Alexander; that he remembered the circumstance of the Carlton bank being robbed; that he saw three strangers at Alexander the evening before the bank was robbed; that he saw them out three or four hundred yards this side of Alexander, sitting on a stock guard of the railroad, that is, the railroad that runs through Carlton and on to Hamilton; that two of these men were larger than the other one; that one was a thick, heavy-shouldered fellow and the other was more of a tall fellow apparently, and one a small man; that he saw two of the men better than he did the other; that one was sitting with his back to him; that he saw the smallest ones; the witness says he believes they called one of them Bowen, and the other one was this big, heavy-set fellow, Probst. Witness continuing says: “They took me over to the jail and. I saw the men that they have charged with this offense; that is, I saw two of them. I saw the small fellow and the large, heavy-set man. I could not swear positively as to this defendant being one of the men that 1 saw there on that cattle guard that evening. When I was before the grand jury I would not do that, and will not here either, but I said then, and say now, that he looks like the man to me; but I would not swear positively, as it had been so long off. It was my best judgment, and is now, that these men were the men; but I did not swear positively that it was them. I testified before the grand jury after I went to the jail and saw these two men. No one pointed these men out to me as being the men charged with this offense. I picked out this defendant as being one of the men that I saw on the railroad track that day there, near Alexander, the day before the bank was robbed.”
W. M1. Harding testified that he lived at Alexander and was working on the railroad as a sectionman, and that his section extended five miles north and five miles south of Alexander; that on the evening before the bank was robbed they were working on the south end of the section and on that evening he saw three strange men as they went into Alexander, about 5 o’clock when he saw them, and they were going into town; that it was about a mile south of Alexander; that there were three men and two of the men were tolerably good-sized men — large men — and one smaller man.” This witness continuing says: “My attention was attracted to the light-complected man more than to either of the others. I came over here to Hamilton to attend the grand jury shortly after the bank was robbed. I went over to the jail and saw the three men that is charg *259 ed with this offense. I identified the light-complected man as being one of the men that I saw on the railroad that day before the bank was robbed. His name is Ed. Marvin. The thing that attracted my attention to the light-complected fellow more than the others was he looked like a light-complected fellow that I knew in Alexander — red-complected, heavy-set man. We passed right along on the road and I suppose I was in four or five feet of this man. I was on the back part of the hand car in the middle. It was not the man that I knew in Alexander that I saw on that occasion. It was as far as from here to the other side of the courthouse when I discovered that the man I was meeting was not the man that I knew in Alexander. That is 10 or 15 or 20 steps, I guess. All of these men were dressed in blue overalls. They had on black hats. 1 do not remember whether they had coats or not. They had on blue overalls. The overalls were bibb overalls. They are the kind that come up over the breast. It does not look like the overalls had been worn but very little. They did not look like working men. They did not have the appearance of being working men. All of the men were strangers to me. That was about a mile from Alexander, where we met those men, south of 'Alexander. Two of the men had bundles under their arms. I noticed these men after I passed them. When I last saw these men they were coming this way towards Hamilton and Carlton.” Again he testified: “I would not swear that this man is one of the men I saw. I did not notice the small man particularly. I just saw the men as they passed, or as we passed, and one of them looked smaller than the others. * * * I do not think the man I saw appeared to be a larger man than this defendant. ⅜ ⅜ * To the best of my knowledge that is about his size.”
Mr. Pugh testified that he lived in Alexander and was engaged in working on the section of the railroad; that about a mile this side of Alexander they met three men, and that they all had on blue overalls, black hats, and dark coats; that one man had a small bundle which he was carrying. Continuing, this witness says: “I noticed the dark-skin, heavy-set fellow more than I did any of the balance. I have seen that same man since then. I have seen him here in the courthouse and also in jail. I heard this man’s name, but cannot get- them separated. I could not tell you whether it was Probst or not. It was one of the men that is being tried for the robbery of the Carlton bank. 1 saw him in jail a few days after they arrested him, when they brought me over here before the grand jury. I did not pay close attention to either one of the other men. It seems like one of the other men was thinner and smaller than the other one, the best I couid tell.”
Morris testified that he lived on - Little Green creek and on the side of the railroad; that he remembered the circumstance of the Carlton bank robbery. He said he saw three men coming down the railroad track the day before the bank was robbed; that he saw them along in the evening; that they had on overalls; that they were blue overalls ; that there were two medium-sized men and one small one; that he was not close enough to describe them by their features; that they all had bundles of some kind; that they had on black hats and were going towards Carlton; that they were something like 200 yards from him when he saw them.
John Maloney testified that he lived about five miles from Alexander and about three miles south of the witness Morris, and about 40 or 50 yards from the railroad; that he saw the parties coming down the railroad track on the evening before the bank was robbed; that it was then getting dark; that they were all walking on the railroad track; that there were three men in the crowd; that he could see the bulk of the men all right; that two of the men looked like good-sized men, and one was a smaller one; that it was not light enough for him to see how they were dressed, and that he did not pay much attention to that anyway; that it was a very windy, blustery night, and these men were going toward Carlton. The proof shows that Probst is a real dark, heavy-set fellow and that Marvin is a light-complected fellow, and that these two men would weigh between 175 and 180 pounds each.
Mr. West testified that he lived in Joshua, Johnson county, and was engaged in the mercantile business there. He testified that he had seen Probst, Marvin, and defendant since he had been to court and he recalled seeing Probst and Marvin before; that three men came into his store in the town of Joshua; that one was smaller than the other two, but that he could not describe him much. He says defendant looks to be about the same size as the smaller man that was in his store, and that he did not get to see him good; that all three of the parties came into his store and the two larger men bought a sack of tobacco and the smaller one walked down and looked over in the witness’ office; that his safe and desk were in his office; that they were in his store some five or ten minutes; that he did not get to see the little man’s face; that this was November 12 or 13, 1908.
The sheriff testified that after the arrest of the defendant he had him in custody at the jail at Hamilton, Tex., under the charge of the burglary of the bank; that defendant broke jail on the night of October 20th and was rearrested some 70 or 75 miles from Hamilton, going in the direction of Fort Worth.
Wilbur Wright testified that he was a conductor on the passenger train of the Texas *260 Central Railroad and tliat liis run was from Waco to Rotan; that this train passes through .Alexander at 3 :20 a. m. going east; that that was the regular time; that it passed through Hico at 3:35 a. m.; that on the morning of the 29th of January, 1909, Mr. Jordan was the only man that he knew that got on the train at Hico, but there were three other men who got on there, but these three men did not get on the train on the depot side, and that they were not on the train when they reached Hico; that he first discovered them on the negro end of the smoker; that they were all sitting together talking when he first discovered them; that none of these men had tickets and he collected cash fares to Iredell and from there one paid to Walnut Springs and two to Morgan, and then one to Whitney and one to Fowler and the other on to Waco, and then they finally all paid cash fares to Waco. The witness says that he got into Waco between 11 and 12 o’clock; that it was 83 miles from Hico to Waco, and that he did not leave Hico on that morning until after daylight; that he was several hours late. Continuing, this witness says: “One of those men was almost six foot tall, very dark-complected, and very high cheek bones, and about 34 or 35 years old and weighed about 175 or 180 pounds. The next one was about 28 years old, also dark-eompleeted, and was not so tall, probably about an inch less, and would weigh about 175 pounds, and the next one would weigh 140 or 135 pounds and was dark-complected, and would weigh about 135 pounds and was about five feet eight or nine inches, and was about 25 years old. These men had a grip with them. I shoved this grip out of the aisle with my foot. It was very heavy. I guess it would weigh at least 30 pounds. One of these men had on two guns, positively, and I saw the impression of two guns on each of the other 'two. I have seen the three men charged with the bank robbery at Carlton, Bowen and Probst and Marvin. Yes, this defendant is one of the men charged with the offense, and I have seen him several times during these trials. These men charged with this offense are not the men that I saw on my train that morning going into Waco, on the morning of the 29th, after the bank had been robbed the night before. Neither one of them are not the men that I carried on my train that morning. My train usually got to Morgan and makes connection with the Santa Fé going north into Ft. Worth, but it did not make connection that day. We were very late that day.” He testified further that he heard the biggest man tell the little one, “By God, you have got to come clean with that money.” On cross-examination this witness says: “The little man was about five feet seven or eight or nine inches. He would weigh about 140 pounds, I judge. His complexion was not very dark. I suppose about as dark as I am. I remember they were dressed in dark clothes. I saw Tom Jordan get on the train that morning. He did not pay cash fare. He had his'ticket. I remember that distinctly. It was to Iredell.”
Watson testified that he was in Alexander on the evening before the robbery and that he saw three strangers in Alexander; that he was in about 150 or 200 yards of them; that they were dressed in black or dark suits; that he could not say the suits were black, but they were dark. There were three men, two of the men were tolerably heavy-built men, heavy set, and men squarely built, and the other was a smaller man. Continuing, this witness says: “I do not know whether the defendant suits in shape and build and make-up with one of those men or not. It seems to me like one of them was slenderer than the others. I do not know and could not say whether the defendant is too low and too small a man for one of those men or not. It seems to me like the smaller man was taller than he is and the other two men were heavier than he is.”
Jordan testified that he lived at Hico and was in the lumber business there and at other places; that in January, 1909, he heard of the circumstance of the robbery of the Carlton bank; that on the morning after that bank was robbed he boarded the train at Hico to go to Iredell on the Texas Central train; that the schedule time for the train to leave was 3 :30 a. m.; that he went for the purpose of taking that train; that he stayed at the depot until about 0:15 and learned that the train would not be there until 7:07; and then went home and got breakfast; that he stayed at the depot some 2½ hours; that the night watchman and four other men were there while he was there. Continuing, the witness says: “I do not know that I can describe those men; I can tell them the best I remember. One of the men was a tolerably large fellow, dark-complected, I suppose between five ten and six foot; and another one that I thought was a little smaller than he and light-complected; and another one a little smaller, but about the same height; and then there was a little fellow. He was a brunette, and I suppose he would weight from 125 to 140 pounds, and was five feet seven or eight inches tall. They had a suit case there with them. I tried to move this case, and did move it a little. I suppose the suit case would have weighed between 50 and 60 pounds. When I went in there I think one of the men had his head on the suit case and was lying down, and maybe another one was lying down, and two of them would be up and down and in and out of the office. It was a very stormy or windy night, and two of them kept going out and leaving the door open is how come me to notice them leaving the office so much. I did not see those men get on the train. I did not see them *261 after they got on the train.” On cross-examination he says: “Yes, I have seen Will Probst. He agrees with a description of one of the men X saw there that night very well. I have seen Ed. Marvin also. If I had met him and he had told me that he saw me on that night, I would have said, ‘Yes, I guess so’; I have seen the defendant, John Bowen, and I think he suits the description very well of one of the men I saw there. There was a little fellow, about his complexion. The defendant is about the size of the small man that I saw that night too. I do not recall any particular difference. It is all guesswork though. It is a fact that he was considerably smaller than the others. I went home for my breakfast when I learned the train was late. I live about three blocks up the railroad and just as I walked out from breakfast, I heard the train coming from Dublin, and I hurriedly went to the depot.”
Defendant reserved in the trial of the case a great number of exceptions.
The first bill of exceptions is to the action of the court in permitting the state to prove by Etherton as to seeing three men on the railroad track at Alexander on the evening before the robbery of the bank, on the ground that the testimony was immaterial because no conspiracy had been shown and because said testimony merely shows conclusions, and not facts. It is sufficient answer to this bill of exception to say that the objection goes more to the weight of the testimony than to its admissibility.
Bill of exceptions No. 2 is to the testimony of Rogers upon the same subject and is without merit.
Bill of exceptions No. 3 is to the testimony of Harding about seeing these parties, and is without merit. We will not undertake to consider these bills of exceptions seriatim and pass upon them, as a great many of them are objections to the testimony of different witnesses as to seeing parties at Alexander and other places in the county, and that these parties to some degree resembled the defendant. All of these objections apply more to the weight of the testimony than to the admissibility of same.
Bill of exceptions No. 9 is to the action of the court in permitting the state to prove by the sheriff as to defendant’s habits while in jail, and as to whether he ate Van Camp’s Pork and Beans, drank Jersey Cream Whis-ky, and smoked cigarettes; defendant’s objection to this being that it was not pertinent or relative to any issue in the case, as the witness did not state what the habits of defendant were before his arrest, and that it was introducing the habits, conduct, and acts of defendant after his arrest, which were not admissible. In about a mile of where the bank was burglarized, as before stated, were found tin cans marked Van Camp’s Pork and Beans, bottle marked Jersey Cream Whisky, and stumps of cigarettes. We suppose the state offered this as a circumstance, for whatever it was worth, to show that the men that were in jail had habits like the men who ate this lunch within about a mile of where the bank was burglarized on that night. This objection goes more to the weight of the testimony than to its competency.
The tenth bill of exceptions is to the action of the court in permitting the state to prove by the witness Florence Marvin that Marvin came to Kansas City about the 5th of February, after the bank robbery, gave her some money; that she saw him with several hundred dollars ¿nd saw him with two $100 bills, and that she came back to Texas with him, and that he bought her clothing, one thing and another, and that he paid her way back to Texas, and that he had a diamond the second time he came to Kansas City and told her that he got it in Fort Worth. That the fruits found in the possession of one of the co-conspirators in the commission of a crime may be offered in evidence against the other conspirators is well settled in this state. See Pierson v. State, 18 Tex. App. 524; Clark v. State, 28 Tex. App. 189, 12 S. W. 729, 19 Am. St. Rep. 817; Pace v. State, 20 S. W. 762. It is true, in the case of Cond v. State, 35 Tex. Cr. R. 98, 34 S. W. 286, 60 Am. St. Rep. 22, the majority of the court held that this character of testimony was not admissible. It seems that in the Cond Case the sash of the deceased was found in the possession of one Estevan about a week after the homicide, and also the gun of the deceased was sold by Gregoria in the presence of Estevan some time after the death. This testimony having been admitted, this court held that the court below should have, in its charge to the jury, limited such testimony to Estevan alone, and that it could not possibly affect Ruperto. The court in that opinion holds that the fruits of the crime found in the possession of one conspirator is on the same plane as his declarations, and are only admissible against the party doing the act or making the declarations. We cannot agree to the conclusions of the court reached in the case of Cond v. State, supra, and in so far as that opinion holds contrary to the opinion in this ease, the same is overruled. We think it is well settled that' wherever fruits of a crime are found in the possession of one party, it may be shown as a circumstance, as a physical fact, independent and inculpatory in its nature, and always admissible. Of course, the acts and declarations of a party are never admissible. This is not the act or declaration of a party, but it is the delivery of the goods that had been stolen. We think all the testimony was admissible, with, perhaps, the remark as to where he bought the diamond; but in view of the other testimony that hé was in possession of a diamond and when arrested had a diamond this testimony, though erroneously admitted, was harmless.
The eleventh bill of exception is to the ac *262 tion of the court in permitting the witness Florence Marvin to testify that Ed. Marvin introduced the defendant, Bowen, to her. There is no merit in this bill.
The twelfth bill of exception is to the action of the court in permitting the witness Florence Marvin to testify that, after the defendant was arrested, she had a small bottle with liquid in it that looked like water and she supposed it was nitro-glycerine. The court’s qualification to this bill is, that he excluded the answer of the witness that she supposed it was nitro-glycerine, and with this qualification of the bill same is without merit.
Bill of exceptions No. 14 is to the action of the" court in permitting the state to prove by the officer that he found on the premises occupied by the defendant, hid out in the barn, three pistols and a lot of cartridges, because same was irrelevant and the discovery of a fact, as defendant says, after his arrest. This testimony was clearly admissible ■as a circumstance in the case.
The seventeenth bill of exceptions is to the action of the court in permitting the state to prove the finding of the bank book at the home of defendant on the night of the arrest, showing a deposit of $800 by Marvin in the Texas State Bank. We think this testimony was clearly admissible as a circumstance in the case, to show the handling of money by these parties and having in their possession a large amount of money shortly after the robbery of the bank, and it was a circumstance going to show that it was a part of the fruits of the crime.
We have noticed all the bills of exceptions relating, as we think, to the questions arising in this case and we are of opinion that they are without merit. We have examined carefully the charge of the court and are clearly of the opinion that the charge of the court was a fair presentation of the law of the case, and it seems that the learned trial judge was very careful to guard every right of the defendant. We are constrained to believe that the testimony was sufficient to justify the verdict of the jury.
The circumstances in this case speak out loudly of the guilt of the defendant. We do not think the testimony of Kidd Wright, relied on so strongly by the defendant, established that these parties were not the parties that committed the robbery. He gives a pretty good description of these men. The description of the men who got on the train at Ilico that morning, as given by the witnesses, suits the description of the defend-aut, Marvin, and Probst. While Wright says, as a matter of conclusion, he does not' think they are the men, yet, Jordan, who had equal opportunity with him and who was in their company for three or four hours, says their conduct was such as to attract his attention by their' frequently going in and out at the door one at a time, and that' their appearance was such as to rivet his attention upon them, and that he feels certain that these were the men who were seen in that depot on that morning. Probst and Marvin are represented as large men, one of them with high, prominent cheek bones, such as to attract attention, the other tall and slender, and one a small man. Most all of the witnesses who saw these men at Joshua and Alexander and Carlton could be positive as to the identification of Probst and Marvin, but they could not with reference to the small man; yet it is passing strange that this defendant, Bowen, who is a small man, had no peculiarities or peculiar marks that would draw attention, and that the same description suits the man seen by the witnesses on the day before the offense was committed. Bowen is found in company with these two men; all of them living together in the same house with their wives and mistresses. It may be regarded as a remarkable coincidence that no other small man was seen with these large men, as the proof shows he was a little man and was the companion of these two large men. Being the boon companion of the two, men identified, is, in itself, evidence of identification. We are clearly of the opinion that the facts and circumstances in the case justify the verdict.
We think the court did not commit error in the admission of testimony, that its charge was the law of the case, and finding no error in the record, the judgment is in all things affirmed.