CHARLES EDWARD SMITH V. THE STATE.

No. 22871. Delivered May 31, 1944.

The opinion states the case.

*J. J. Byrne* and *J. V. Hammett,* both of Lampasas, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant, a man 46 years of age, an itinerant painter, was charged with the murder of Mrs. Hazel Weeks, and upon conviction by the jury he was assessed a penalty of 38 years in the State penitentiary. His wife, Mrs. Ada Smith, was also charged in a separate indictment with the same offense; however the record showed her death while confined in jail prior to this trial.

The record shows that Mrs. Hazel Weeks, the deceased, was the wife of Arthur H. Weeks; that she had some five children by a former marriage, two of whom lived in a house trailer with her and her husband in a San Angelo, Texas, tourist camp. About the middle of September, 1941, the Weeks met appellant and his wife at the tourist camp. Mrs. Weeks soon seemed to become infatuated with appellant, their views coinciding on religious questions, and one afternoon these two took Mr. Weeks'

car, and driving down to the city dump ground, they engaged in an act of sexual intercourse. On the next day Mrs. Weeks left her family and seemed to have joined the Smith family. Mr. Weeks objected to this procedure, and enlisted the help of peace officers in an endeavor to regain his wife, but she refused to return to him. Within about two days thereafter appellant, his wife and Mrs. Weeks left San Angelo, and were next found in Brownwood, Texas, and at the time of their leaving Mrs. Weeks was in good health, about 5 feet 9 inches in height, and weighed about 110 pounds.

There is a roadside park on the highway just out of the city of Lampasas, located where the highway going north towards Hamilton No. 281 meets a highway from the west coming from Brownwood and points west therefrom, No. 190. On October 21, 1941, the decomposed body of a deceased woman was found, not in sight of any park benches nor of any road, in a small ravine in this park, in a secluded spot, lying in a grotesque position, with the left hand behind the back, and from its condition it was evident that this person had been dead for an estimated two to four weeks. The head of this body was lying some eight feet away from the torso, and the vertebrae thereof evidenced a clear severance of the body structure. This body was identified as that of Mrs. Hazel Weeks. There were shoe tracks, evidently those of a man, in the ravine and directly on each side of the body, staggeded in the approach thereto, as of one bearing a burden.

Dr. Rollins, one of the owners of a hospital at Lampases, and a practicing physician and surgeon, testified as follows:

"In October 1941 and for several months prior and subsequent thereto, I was a practicing physician and surgeon in Lampasas, Lampasas County, Texas, being one of the owners and connected with the Brooks-Rollins Hospital in said city; that on or about the 21st day of October, I was called upon to view and examine the body of a woman in the Roadside Park, about two miles north of the town of Lampasas; that upon examination it was my opinion that the deceased had been dead for two weeks or longer; that the body was in such state of decomposition that it was impossible to determine the cause of death; there were no recognizable signs of violence but at the same time the condition of the body was such that violence could not be excluded. From the examination it was impossible to determine the cause of death. The examination did not reveal any fractured bones, I made no X-ray examination. I could not

say that the woman did not die of a natural cause, neither could I say that she did."

Appellant was arrested in August, 1943, and charged with causing the death of Hazel Weeks. He made two written statements after his arrest, and after reciting the warning and some preliminary matters the first statement reads as follows:

"And I wish to further say: This 16th day of August concerning the case of Mrs. Hazel Weeks: I left San Antonio with my wife early in Sept. 1941 in a ford sedan, 1930 model, in route to San Angelo. Arrived in San Angelo 3 days later, and parked my car and put up my tent in a parking lot leased by Mr. Barbee in San Angelo on Chadbourne St. We became acquainted with a Mr. & Mrs. Weeks, who were living there in a house car. After several conversations held in their house car took place we became agreed on several matters of religious doctrine. Mrs. Weeks and I alone in Mr. Weeks car made a trip to the city dump where a sexual relation took place between us.

"Mrs. Weeks the next day came to our tent and announced her intentions of leaving her husband. She stayed in our tent a couple of days, in bed not really sick, but feeling a need for rest. Her husband came once to our tent to ask her to return but she refused.

"That day I was down town working. On returning, I found that Mr. Weeks had moved his house car and left the Park. That night we packed our car, and we left the parking grounds taking Mrs. Weeks with us. We stopped later that night in a roadside park near Ballinger and slept. Mrs. Weeks and I on separate folding cots. My wife in the car. Ate breakfast in the morning and proceeded to Brownwood.

"We rented a house car on the edge of town for a week. After returning from work the first day I noticed for the first time that Mrs. Weeks' mind was not normal. We stayed in Brownwood several days during which time her mind became much worse. On one occasion she had to be suppressed from screaming. On one occasion I held a towel over her mouth for a few seconds and she subsided. At the time we left Brownwood Mrs. Weeks was quiet, and continued so for some time.

"We headed in the direction of Lampasas. It rained hard that night and we arrived, after detouring, in Lampasas around or near 10 or 12 o'clock, as near as we can estimate the time.

"Seeing a roadside park just west of town, we rode a short while seeking the entrance. We parked our car in the park and set up a cot for Mrs. Weeks. My wife and I slept in the car. During the night my wife and I discussed the conditions, we were laboring under, for it was evident to us that Mrs. Weeks' condition was not improved.

"We arrived in Lampasas on or about Sept. 24, 1941. We decided to leave Mrs. Weeks in the roadside park where she would be found, and place her in the Insane Hospital, which we were led to believe was in Lampasas.

"After daylight in the morning, after we had eaten and fed Mrs. Weeks, we led her to a seat in the park, and my wife and I then left the park. When we left the park Mrs. Weeks was still alive and sitting on a bench in the park. We then left the park and headed for San Antonio.

"We never spoke of any of this to anyone until one day about July 7 or 8, 1943. I being in San Angelo saw Mrs. Weeks' son. He was a one eyed boy about 14 years old, which is how I recognized him. He was sitting in a truck on a San Angelo main street. The boy recognized me. I talked to him asking him where his mother was. He said he did not know. I then told him his mother was in an asylum for the insane in Lampasas.

"At the time I saw the boy and informed him where his mother was living, as I thought, I was living in Abilene, Texas, where I had lived a year and a half. We then moved to Wichita Falls, arriving there July 23. I was taken in custody there on morning of Aug. 11, 1943."

Again, two days later appellant made the following additional statement:

"We led Hazel Weeks up to a bench in the roadside park near Lampasas. My wife returned to car. Hazel was carrying on, I was under great stress, nerves shot. In order to make Hazel sit down, I hit her with my fist pretty hard. She subsided. I didn't know at the time she was dead. I haven't known since that she was dead. I returned to the car, we backed out of the park and left her. My wife didn't know anything about me hitting the woman. When we came back after going for curtain, we didn't see Hazel because we didn't look."

Dr. Brook, a practicing physician, testified, in answer to a hypothetical question that a blow from the fist of a man of appellant's size and strength could produce death, but such would

be usually based on some inherent weakness or disease-upon the part of the deceased person; he thought that in the advanced state of decomposition that this body was in it was possible for vultures or vermin to have separated this head from the body; it would take expert dissection to separate the head by a person skilled in the structure of the human body in order not to leave some detectable sign of violence; it would be hard to cut the head off without damaging the bone, and it is here worthy of note that the bones at the point where this head was severed bore no evidences of being cut or scarred.

Appellant's attorneys complain because of the failure of the State to show that Hazel Weeks came to her death by means of a criminal act; that the State has failed to establish the corpus delicti, or the body of the crime, by showing that the deceased came to her death by means of violence inflicted upon her by anyone. The doctrine prevailing in matters relative to the proof of the corpus delicti demands that in a homicide there must be shown that deceased came to death by the act, agency, procurement or culpable omission of another. See Treadwell v. State, 16 Tex. App. 560; Conde v. State, 35 Tex. Cr. R. 98, 34 S. W. 286, and many other citations in Branch's Penal Code, p. 1049.

Again Mr. Branch says: "Proof of the corpus delicti is not sufficient when the death of deceased by violence inflicted by another is not proven," citing cases.

The term corpus delicti as applied to a homicide contemplates not only proof of the identity of the body of the person alleged to have been killed, as is demanded by Art. 1204, Penal Code, but also that such person came to his death by some criminal act of omission or commission. We said in Lott v. State, 60 Tex. Cr. R. 162, 131 S. W. 553:

"It is essential to a conviction for any degree of culpable homicide, first, that the deceased should be shown to have been killed; and, second, this killing should have been proven to have been criminally caused by the act or agency of the defendant, and unless the corpus delicti in both these respects is proved, a confession is not by itself enough to sustain a conviction. Again, an extrajudicial confession standing alone is not sufficient proof of the corpus delicti. But a confession is sufficient if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction in the minds of the jury beyond a reasonable doubt. And such suppletory evidence need not be conclusive in its character."

We are cited to the case of Lovelady v. State, 14 Tex. Cr. App. 545, which case furnishes us reasoning closely analogous to the instant case wherein it is said:

"And on the well known principle that in capital cases this criminal agency of the defendant cannot be proved on his confession alone, without proof of the corpus delicti, it must not only be shown, to justify a conviction in such a case, that the deceased was dead, but that his death was criminally produced. Unless the corpus delicti in both these respects is proved, a confession is not by itself enough to sustain a conviction."

Wharton on Homicide, Sec. 587, citing many Texas cases, says:

"The corpus delicti in homicide consists of the criminal act and the resulting death, and the agency of the accused in its commission. As to it, it is requisite, first, that the deceased should be shown to have died from the effects of a wound; second, that it should appear that the wound was unlawfully inflicted by the person charged. It consists not merely of the objective crime, but also of the agency of the accused in the crime. It is made up of two things, first, certain facts forming its basis, usually the death of the deceased, and second, the existence of criminal agency as the cause of them. The corpus delicti cannot be said to be established in homicide until it is proved that the death was not caused by natural causes, or by accident."

In the case of Follis v. State, 101 S. W. 244, we find that this court held that the corpus delicti was not sufficiently established, although the accused in his confession stated that he had killed the deceased by striking him with an axe and cutting him with a knife, the deceased's body not being found for some weeks thereafter, and no close examination thereof being made, and there being no further testimony other than the confession relative to such violence.

In the case of Conde v. State, 34 S. W. 286, an accomplice testified to assisting the accused in the burial in a thicket of the body of the deceased, and to the fact that the face of deceased was covered with a bloody cloth. Some days thereafter the body was disinterred, in advance decomposition, and no signs of any applied violence was found thereon. This was held to not establish the corpus delicti. The authorities are numerous supporting the doctrine set forth above. However, we do not intend herein to disturb the holding in the case of Kugadt v. State, 38 Tex. Cr. R. 692, 44 S. W. 989, that a confession of an accused

can be used in aid of the establishment of the corpus delicti, and can be taken in connection with other facts and circumstances in evidence, and that such other facts need not be conclusive in themselves.

To put the State's case in its most favorable light under the two confessions hereinbefore quoted, it has proven that appellant struck deceased "with my fist pretty hard," but when they left her she was alive and sitting on the park bench. Bearing in mind that the State introduced these statements, the burden was upon it to either disprove the fact of Mrs. Weeks being alive when appellant left her, or that she died thereafter from such blow, and we are of the opinion that it failed to discharge such burden.

Again, in the case of McDonough v. State, 178 S. W. (2d) 863, we held that where accused struck the deceased with his fists and knocked him down and kicked him with his feet, and left the deceased unconscious upon the floor, that such conduct alone did not evidence an intent to kill.

Appellant's attorneys, appointed by the court, are to be commended for their efforts herein in his behalf, and their exhaustive brief has been of assistance to us.

In line with what we have herein indicated, we hold that the State has failed to establish the corpus delicti, and this judgment is therefore reversed and the cause remanded.